[Sac. No. 2832. In Bank.—November 23, 1920.]

LYDA ROBINSON et al., Respondents, v. WESTERN STATES GAS AND ELECTRIC COMPANY, Appellant.

[1] ELECTRICITY—PLACING OF WIRES—REASONABLE CARE.—It is the duty of an electric power company in placing wires for the transmission of electricity to use all reasonable care necessary to prevent the electricity from escaping from the line in such a manner as to be dangerous to persons or property.

[2] ID.—MAINTENANCE OF POLES—PROXIMITY TO VANE OF WINDMILL —NEGLIGENCE.—It is negligence for an electric company in maintaining a branch line to a windmill on private property to allow the poles to remain so placed that the vibration of the poles and the windmill from the wind, coupled with the settling and leaning of the poles, might bring the wires and the vane in contact.

[3] ID.—CAUSE OF DEATH — EVIDENCE — CLAIM FOR SERVICES AT INQUEST.—In an action for damages for death alleged to have been caused by shock of electricity from the defendant's negligently maintained power line, a claim presented to the county by a physician for his services at the inquest showing a nominal charge was hearsay and incompetent to controvert the effect of the death certificate as evidence that acute dilation of the heart was the cause of death.

[4] ID.—MISCONDUCT OF COUNSEL—READING PART OF REJECTED CLAIM —LACK OF PREJUDICE.—In such action, misconduct of counsel in

CLXXXIV Cal.— 26

reading a portion of the contents of such claim when offering the same in evidence was without prejudice where the claim was rejected and the jury instructed at the close of the evidence that by reason of the failure of the plaintiff to produce the physician as a witness to contradict the recitals of the death certificate concerning the cause of death, a presumption was raised that if produced he would testify in accord with the recitals.

[5] Misconduct of Counsel—When Prejudicial.—Misconduct is not cause for reversal or a new trial unless it has the effect of preventing the complaining party from having a fair trial.

[6] Electricity—Evidence—Subsequent Shock.—In an action for death alleged to have been caused from an electric shock received through handling a chain attached to a windmill located in close proximity to electric wires, evidence that some three months after the death another person received a shock in the same manner was admissible where the same circumstances were shown to exist.

[7] Id.—Effect of Shock.—In such action, evidence that the shock received by the witness caused his lip to swell and crack and his chin to become discolored was admissible as showing that the effect of the shock was to create those appearances and that they were almost identical with those found on the body of the deceased.

[8] Id.—Testimony of Nonexpert.—In such action, evidence of an electrician of many years of experience and observation as to the effects of electric shocks was admissible although he was not a physician and had received no special academic education concerning the result of such shocks.

[9] Id.—Construction and Maintenance of Power Line—Duty of Defendant—Instruction.—In an action for death alleged to have been caused from an electric shock received through handling a chain attached to a windmill located in close proximity to electric power wires of defendant, an instruction that it was not only the duty of the defendant to construct its power line leading to the mill in a safe, substantial manner, but also to keep it in such condition by constant oversight and repair, is not subject to the objection that the jury would be required to find the defendant guilty of negligence unless the line was built and maintained so that it would be absolutely safe, when considered with other instructions that the defendant's duty was discharged when it had used due care to make the line safe from injury.

[10] Negligence—Action for Death—Separate Awards Unauthorized.—A verdict awarding separate damages to each heir in an action for death brought under section 377 of the Code of Civil Procedure is unauthorized, since the section does not authorize separate actions by the several heirs.

[11] Id.—When Insufficient Ground for Reversal.—A verdict awarding damages for death to each heir is not sufficient to warrant a reversal of the judgment where the damages are not excessive.

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Affirmed.

The facts are stated in the opinion of the court.

Chickering & Gregory, Evan Williams and Donald Y. Lamont for Appellant.

Elliot & Atkinson and White, Miller, Needham & Harber for Respondent.

SHAW, J.—The defendant appeals from the judgment.

The plaintiffs sue as heirs of William S. Robinson, deceased, to recover damages accrued to them from his death, which it is alleged was caused by the negligence of the defendant. Lyda Robinson is the widow and Eliza J. Robinson the mother of the decedent. Both of them were at the time of his death dependent upon him for support and maintenance.

The defendant was operating power wires by means of which it was in the business of transmitting electricity from its power plant to consumers. Robinson owned a farm on which he maintained a windmill. The upper part of the windmill was made of metal and was so arranged that the fans could be turned in any direction by means of a chain and a small wire attached to the metal parts at the top of the mill and hanging down to within three feet of the ground. A branch of the power line maintained by the defendants, consisting of three transmission wires, ran to said windmill. It is alleged that the defendant negligently constructed said power line so that by the natural operation of the wind, water, and gravity its wires carrying electricity would be likely to come in contact with the metal parts of said windmill and that as a consequence said wires did come in contact with the same; that the soil about the mill was damp and the electric current would readily turn from said

11. Excessiveness or inadequacy of verdict in action for injuries resulting from electric shock, notes, 16 Ann. Cas. 47; Ann. Cas. 1916B, 409.

wires and flow down said small wire and chain to the ground whenever anyone standing on the ground should take hold of or touch said chain to turn said windmill; that it was necessary in the course of his farming operations for said Robinson to turn said windmill into or out of the wind by grasping and pulling said chain and wire; that all this was known to the defendant; that while said Robinson was manipulating said windmill in the course of his farming operations he grasped said chain for that purpose while the metal part of said mill was in contact with one of said wires, he being unaware of any danger therefrom, and that by reason of the carelessness aforesaid the electricity then being carried over said wires of the defendant was transmitted to and through the body of said Robinson into the ground, greatly injuring him and causing his death.

The main power line of the defendant ran along the road in front of the Robinson farm. In May, 1913, a branch line running to his house for lighting purposes was extended about six hundred feet to the windmill to carry power to run the pump. Robinson proposed to substitute an electric motor for the windmill. He had not procured the motor at the time of his death, but an electric current of eleven thousand volts had been turned on the wires of the branch line. The windmill was constructed in the usual manner upon a wooden frame of four uprights, forming a square about eight feet in size at the bottom and converging toward the top. When first built, one of the wires of the branch line was about twelve inches from the vane of the mill when it was turned toward the wire. In the fall of 1913 transformers weighing six hundred pounds were placed near the top of the two poles nearest the mill. From the weight of these, the force of the wind and the softness of the ground in which the poles were set, they began to lean toward the mill. Ten days before his death there was a heavy windstorm which blew down several poles of the main line and threw other poles out of plumb.

There was no eye-witness to the death of Robinson. He left his house a little before 10 o'clock in the forenoon of February 19, 1915, and some time after 10 o'clock his body was found under the windmill lying within the square formed by the uprights of the frame, close to the chain used for turning the mill.

The claim that the evidence is insufficient to prove that the deceased was killed by a shock of electricity from the defendant's wires cannot be upheld. The evidence is wholly circumstantial, but it is sufficient to raise a reasonable inference that such electricity was the cause of his death. As above stated, the top of the windmill and the nearest wire were only twelve inches apart when the line was constructed. Afterward the poles were seen to be leaning toward the mill. It was extremely probable that the vibration of the two under the influence of a strong wind would bring them into contact. The power wire was carrying eleven thousand volts. If it came in contact with the vane of the mill the current would be likely to pass therefrom down the wire and chain and to the hand of the person grasping the chain. If the ground was wet, as the evidence showed, this would close the circuit from the power line to the ground through the body of such person. When Robinson's body was found his lips were swollen, the lower lip was split open, there was a clot of blood at his nose and the right side of his face and chin, his right ear and the right side of the neck was discolored, and his neck swollen and enlarged. There is evidence that these symptoms would not be caused by heart disease, which the defendant claimed was the cause of his death. No such appearances were on his body when he left the house for the mill. Evidence was given by a person not a physician, but who had had the experience of seeing a number of persons injured by electric charges, to the effect that a swelling of the neck and discoloration of the skin or flesh appeared upon such persons immediately after the shock. It was shown that some three months afterward, with conditions substantially as they were at the time of his death, a young man who was manipulating the windmill by the chain received a severe shock of electricity which caused his lip to swell and crack and become discolored. The only evidence of any other cause of death was testimony to the effect that he had shortly before his death complained of pain about his heart and a certified copy of the record of the death of Robinson, issued by the state registrar under the act of March 18, 1905, as amended in 1907 (Stats. 1905, p. 115; Stats. 1907, p. 296), showing the record of facts required to be kept by that act relating to the death of persons, and, among other things, that the cause of his death was "acute dilatation of heart." It also contains this statement: "I hereby certify *post-mor-*

*tem* Feb. 20, 1915." This statement appears to have been made by A. D. Fenton, the coroner of Sacramento County, and by him reported to the state registrar. It also appears to have been signed by J. Milton Ward, M. D. Section 15 of the Act (Stats. 1907, p. 300) provides that a copy of the record of the death made under the act, when certified by the state registrar or local registrar to be a true copy thereof, shall be *prima facie* evidence in all courts of the facts therein stated. Section 6 of the act requires that the certificate of death shall state, among other things, the cause of the death. In this case the death occurred "without medical attendance." In such cases section 7 provides that the coroner shall within three days after the inquest furnish the local registrar a certificate as required by the act containing as many of the facts required as can be ascertained, and that the local registrar shall then transmit such certificate to the state registrar. It is obvious, therefore, that the statements in the certificate must have been founded upon hearsay, and that although made *prima facie* evidence by the act, it is not entitled to a very high degree of credence in the face of other evidence on the subject tending to show another cause of death. But however this may be, this evidence relating to heart disease as the cause of death had no effect further than to produce a conflict in the evidence upon which the decision of the jury is final.

It is not seriously contended that the evidence is insufficient to show that the defendant was guilty of negligence proximately causing the death, if we assume electricity as the cause. **[1]** It was the duty of the defendant in placing wires for the transmission of electricity to use all reasonable care necessary under the circumstances to prevent the electricity from escaping from the line in such a manner as to be dangerous to persons or property. **[2]** It was negligence to allow the poles to remain so placed that the vibration of the poles and the windmill from the wind, coupled with the settling and leaning of the poles, might bring the wires and the vane in contact. A violent windstorm occurred a few days before the accident which blew down a number of the poles of its main line. A day or two after and before the accident the defendant repaired this line, but there is no claim that it even inspected the branch line, while at the same time maintaining therein a current of eleven thousand volts. There being evidence that the death was caused by

electricity, it is only reasonable to conclude that the wires and the vane did come in contact at that moment, thus establishing the negligence in placing the two so near together as the cause of death.

Appellant further contends that there was prejudicial misconduct both by the court and by the attorneys for the plaintiff; also that the court erred in its rulings on evidence and in giving an instruction to the jury.

[3] The principal assignment of misconduct is that the plaintiffs' attorney during the trial, when offering papers in evidence, attempted to read the contents of the incompetent documents in the presence of the jury, and that the court failed to use sufficient promptness in preventing him from doing so. In order to controvert the effect of the death certificate as evidence that acute dilatation of the heart was the cause of the death, the plaintiffs offered in evidence a claim presented to Sacramento County by Dr. Ward for his services at the inquest upon the body, showing a charge of only five dollars and solely for examining the body. The evidence was hearsay and incompetent. It was not necessary for the plaintiff, in making the offer, to read the document or state any portion of the contents thereof, and the court, under the circumstances of the case, should have prevented him from doing so. He proceeded, however, to read enough to show that the claim was only five dollars and that it had been allowed and paid. An objection to its admission was sustained and the document rejected as evidence. After the close of the evidence the jury was instructed that by reason of the failure of the plaintiff to produce Dr. Ward as a witness to contradict the recitals of the death certificate concerning the cause of death, a presumption was raised that if produced he would testify in accord with said recitals. [4] We think the ruling rejecting the evidence and this instruction, taken together, so far lessened the injurious effect of the misconduct aforesaid that it cannot be deemed sufficient to justify a reversal of the case. [5] Misconduct is not cause for reversal or a new trial unless it has the effect of preventing the complaining party from having a fair trial. (Code Civ. Proc., sec. 657, subd. 1.) The other assignments of misconduct are too trivial to be worthy of discussion.

[6] The defendant insists that the court erred in admitting evidence that the witness Brugler received a shock of

electricity some three months after the death of Robinson when he was grasping the chain at the windmill. We think the evidence was properly admitted. There was evidence to show that the circumstances at the time he received the injury were substantially the same as those existing when Robinson came to his death. Under these circumstances it is proper to prove the effects of the conditions so existing, upon the principle that if an electric shock was produced upon Brugler, it would be probable that it might have been produced upon Robinson under the same circumstances. Proof of other manifestations of electric contact between the wires and the windmill about the same time was admissible for the same reason.

[7] The evidence that the shock received by Brugler caused his lip to swell and crack and his chin to become discolored was properly admitted. It showed that the effect of the shock was to create those appearances and that they were almost identical with those found on the body of Robinson. Evidence to prove the effects of such shocks may be given in other ways than by the testimony of experts. Actual occurrences under the same conditions showing the effects is competent proof thereof. It tended to prove that Robinson also received an electric shock.

[8] The same rule applies to the admission of testimony of the witness Cannon. He testified that he was engaged in electrical work, and had been for about fourteen years; that he had received electric shocks himself and that he had seen other people receive electric shocks of fairly high voltage about a dozen times. He described the effects of electric shocks upon the body of a man at the moment of receiving them and also testified that one of the results was a swelling of the neck and of the tongue, and that afterward a discoloration of the skin appeared. The testimony was relevant, and although the witness was not a physician and had received no special academic education concerning the results of electric shocks, he had had many years of experience and observation and was competent to testify as to the results of his experience and observation on that subject.

The defendant called Mrs. Stevens, a sister of the deceased, to testify concerning the heart trouble. She testified to several complaints by deceased at different times of pain in his heart. Claiming to be surprised at the testimony of the wit-

ness, the defendant's attorney offered to ask her about her testimony at the coroner's inquest on the same subject. Objection was made that the answer was not impeaching and did not tend to explain the surprise. The objection was sustained. There was no error in this ruling. Her testimony at the coroner's inquest was a more condensed statement than her testimony on the trial, but was not essentially different therefrom.

The court gave the following instruction: **[9]** ''It was not only the duty of the defendant to construct its power line leading to the mill on the Robinson premises in a safe, substantial manner, but also to keep it in such condition by constant oversight and repair.''

The defendant urges that under this instruction the jury would be required to find the defendant guilty of negligence unless the power line was built and maintained so that it would be absolutely safe against injury from the escape of electricity. If the instruction had been standing alone it possibly might have been so understood. But the court instructed the jury very elaborately to the effect that the defendant's duty was discharged when it had used due care to make the line safe from injury to others, and that due care required that the wires be so placed with reference to other conducting agencies that dangerous contact would not be probable. These charges were repeated several times and the jury could not have failed to understand that the care required of the defendant was the reasonable care required by the circumstances and the character of the agency under its control.

The defendant complains of many rulings of the court in addition to those above noticed. We do not think any of them are of sufficient importance to justify us in mentioning them.

At the direction of the court the jury returned a verdict for separate damages to each plaintiff, giving two thousand dollars to each of them. The defendant excepted to the instruction which directed the verdict in that form, but the record does not show that any objection was made when the verdict was returned, or at any time afterward in the court below, except by the specification that the verdict was against law, in the notice of intention to move for a new trial. The specifications in the bill of exceptions stating the particular reasons for the claim that the verdict was against law do not

mention this cause as one of them. There is no specification, and no claim, that the evidence is insufficient to justify a verdict for four thousand dollars or two thousand dollars to each or either of the plaintiffs, nor any claim that the damages are excessive.

[10] The law does not authorize a verdict in this form. The action by the heirs of a person to recover damages for his death is authorized only by section 377 of the code. That section does not authorize separate actions by the several heirs. "So far as the heirs are concerned, a single joint cause of action is given. The language of our statute permits no other construction." (*Salmon* v. *Rathjens*, 152 Cal. 294, [92 Pac. 733].) So it is held that in computing the damages "the loss of each and all must be considered. The statute does not provide for a distribution among the members of the family who take as beneficiaries of the statute. . . . It is not intended that the amount recovered shall be divided into integral or proportional parts. The persons entitled do not take as heirs or by succession, but as beneficiaries of the statute; the statute being framed upon the theory that the heirs will always constitute the family of the deceased." (*Simoneau* v. *Pacific etc. Co.*, 159 Cal. 494, 508, [115 Pac. 320]. See, also, *Daubert* v. *Western Meat Co.*, 139 Cal. 480, [96 Am. St. Rep. 154, 69 Pac. 297, 73 Pac. 244].) The verdict should have been given for a lump sum to all the plaintiffs, including, of course, the damages to each of them. [11] But we are unable to perceive that any injury has been suffered by the defendant on account of the verdict having been rendered in this form. It is said that the plaintiff, Lyda Robinson, took an appeal from the judgment. It is also said that this appeal was dismissed by her without any decision on appeal. Neither of these statements is denied by the other party. It is possible that complications arising from an appeal by one of the plaintiffs in such a case would require a reversal of the case because of the separation of the damages by the verdict and judgment, but as it is conceded that the appeal has been dismissed no injury could arise therefrom. The defendant has no interest in the division which the plaintiffs may make among themselves, or which may be made for them, of the damages recovered. The statute contemplates a single recovery for the benefit of the family of the deceased or those of his heirs who are de-

pendent upon him for support. Whether it is divided among them after recovery or not, or how it is divided, are matters of no concern to the defendant. If the damages are not excessive, as is in effect admitted by the failure to object on that account, the defendant has no reason to complain, or at least his reason is not sufficient to warrant a reversal of the judgment, because of this defect in the form of the judgment.

The judgment is affirmed.

Olney, J., Lennon, J., Angellotti, C. J., Lawlor, J., Wilbur, J., and Sloane, J., concurred.