[Sac. No. 6635.   In Bank.   Dec. 9, 1955.]

HAROLD K. BERESFORD et al., Respondents, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

Robert H. Gerdes, John J. Briare, Edmund M. Moor and Anthony J. Kennedy, for Appellant.

Rawlins Coffman and L. C. Smith for Respondents.

SCHAUER, J.—Defendant Pacific Gas and Electric Company appeals from a judgment rendered against it in plaintiffs' action for damages for the destruction of their property by fire, assertedly caused by negligence of defendant. As grounds requiring reversal defendant urges insufficiency of the evidence to support a finding of negligence on its part, as well as various allegedly prejudicial errors on the part of the trial court in the admission and exclusion of evidence and in instructing the jury. For reasons hereinafter stated, we have concluded that defendant's contentions are without merit, and that the judgment should be affirmed.

Plaintiffs owned and operated a resort at Mineral, which is located in the mountains in Tehama County, about 40 miles east of Red Bluff. During the early morning hours of January 10, 1949, the main lodge building at the resort was completely destroyed by fire. Plaintiffs' charge of negligence against defendant is based upon their claim that a tree which admittedly fell across defendant's power line caused that line, from the manner of its construction, maintenance and operation, to come in contact with and energize telephone

lines leading to plaintiffs' lodge, thereby causing a fire to break out in the telephone switchboard located in the lodge.[1]

The record shows that in 1939 plaintiffs granted to defendant a right of way for the erection of a transmission line, referred to by the parties as a "tap line." Pursuant to the right of way so granted, defendant constructed the tap line from its main power line which was located a short distance south of the highway (California Highway 36) running easterly through Mineral. Along the north side of the highway, parallel to and 30 feet distant from it, were telephone lines, some of which led to a switchboard at the lodge building about one-half mile to the east of the "Hazen Cabin," near which stood the tree that fell. The tap line, which furnished electric power to the Hazen Cabin, as well as to a seismograph station of the University of California, crossed over the highway and the telephone lines at approximately a right angle; it was about 326 feet in length, uninsulated, and carried some 11,000 volts of electricity. Near the north end of the tap line was located a transformer from which defendant took two 110-volt service connections.

On the north side of the highway, 25 feet east of the tap line and 59 feet north of the telephone lines, stood a cedar tree 110 feet tall and between 150 and 200 years of age. It arose some 75 feet above the 35-foot poles that supported the tap line. The telephone lines were supported below the tap line, on a separate pole. At the base of the tree was a fire burn, termed by the witnesses a cat face, which "possibly weakened" the structure of the tree "some." The tree was 32 to 35 inches in diameter at breast height and leaned between 5 and 10 degrees "toward the highway down the slope." After the tree fell the presence of some dry rot was discovered, although the witness, District Forest Ranger Brokenshire, who testified as an expert on trees, stated that "I looked at the cat face and I would have noticed if it was badly dry rotted." Brokenshire examined the tree in August, 1949, some seven months after it had fallen and it "didn't appear to be extremely defective . . . It's a tree that isn't likely to die because of any disease or defect." The tree did, however, stand by itself in a cut-over area where the high winds

---

[1]Also named as a defendant was Public Utilities California Corporation, which the evidence showed to have installed and controlled the switchboard and the lines leading into it. A judgment of nonsuit was entered in favor of such defendant, and plaintiffs' appeal therefrom was dismissed in 1952. (*Beresford* v. *Pacific Gas & Elec. Co.,* 113 Cal.App.2d 622 [248 P.2d 773].)

which were "common to the Mineral area" could exert full force against it. Brokenshire stated that in view of such winds "I wouldn't say that any tree at Mineral was safe."

On the stormy night of January 9 and early morning of January 10, 1949, a so-called "very severe" wind of 25 to 30 miles an hour was blowing from the northeast. Between midnight and 1:30 a. m. the tree fell; although the exact time is unknown the records of the University seismograph station indicate a power failure at 12:35 a. m. Admittedly the tree fell across the tap line, and it is plaintiffs' theory that the tap line was thus forced into contact with the telephone lines, thereby energizing them with the high voltage current and causing the fire. Defendant urges that plaintiffs failed to prove not only such contact, but that if it occurred the fire could have been caused thereby. Defendant's Exhibit I shows the tree lying with its top pointing to the southwest, after falling across the tap line at almost the exact point of its intersection with the telephone lines running beneath it, and thence across the highway, thereby blocking the westbound line. Between 1:30 a. m. and 2 a. m. the fallen tree was discovered by a traffic officer, who "could see the wires rather low," although he could not state whether electric or telephone wires. When the tree fell the tap line was not broken and the power remained on until about 3:14 a. m., when a truck which was then being driven past the fallen tree contacted and broke the wires, thereby causing the circuit breaker in defendant's South Power House to operate and bells to ring, awakening the attendant. Prior to that alarm no safety or protective device on defendant's power system interfered with or shut off the escaping power.

No witness produced at the trial saw the origin of the fire, which was observed as early as 1:20 a. m. and lasted until 4 a. m., burning the entire lodge building and its contents. Shortly after 1 a. m., however, an employe of plaintiffs observed a fire in the lodge, which he described as coming from the area of the telephone switchboard. Witnesses living in the neighborhood testified to the continuous or "hot" ringing of their telephones at various times commencing about 1:30 a. m. Also, blue flames and sparks were shooting out from electric switches in their homes, and in some instances fuses were blown in the homes and carbon blocks were burned. One of two United States Forest Service communications system repeater coils which were located side by side on a terminal pole near the lodge and through which the escaping

power traveled, was burned out; the second, which was in no way connected with the lines on which the power was escaping, was undamaged. It was the opinion of the Forest Service communications officer that the damage "was caused by a high rate of current flow through a repeater coil for some little time—not an instantaneous surge that was discontinued," and that the damage was more severe than that caused by lightning. One of the telephone lines which led into Mineral lodge "did go into this particular repeater coil that was damaged." An electrical engineer who is defendant's retired former employe and who testified for defendant, stated on cross-examination that "if I was informed that the repeater coil burned up very shortly after the time the tree fell into the line, then I would say it had some connection with the falling of the tree. . . . It would indicate the possibility of a contact between the power wires and the telephone wires." In response to the question "Where else in the world could it get that electricity sufficient to burn out that coil except from the tap line?" the witness replied, "I don't know."

The witness Lynch, an electrical engineer and manufacturer of long distance communication equipment, who had inspected the telephone switchboard installation at Mineral lodge before the fire, stated that a protection device known as a Kellogg arrester or protector block had been installed; that such apparatus "may or may not include fuses, but it must always have what they call a gap . . . designed to be open under ordinary telephone usage. It is merely a closely spaced device made of either carbon blocks or metal and mounted close to each other and then designed to flash or break down in the event of . . . voltages in general above 600 volts" or of lightning. Its purpose is to protect the switchboard equipment from damage. A Kellogg arrester "normally does not contain both" the gap and a fuse. The witness could not say "with certainty whether there were fuses or whether there weren't fuses," on the lodge installation. Neither could he predict whether, with the arrester present, the result of the induction of more than 600 volts in the telephone lines "would be to ground," as "It has too many variables behind it." As a "rough rule of thumb" and estimate, the gap in an arrester block "has a tolerance of 5,000 volts to each quarter-inch"; i.e., the voltage would arc or jump "a quarter-inch for about 5,000 volts." Without fuses the arrester at Mineral lodge would have had a gap of 4 inches, but "If there were fuses there that would not be the gap. Now, I

don't remember whether fuses were there or not." The probable outcome "of the induction of a greater voltage than will pass through the arrester is, in the absence of fuses, to destroy or burn the . . . outside telephone lines . . . although . . . it plays such funny pranks you can't be certain."

Two expert witnesses, both electrical engineers and at the time of trial employed as instructors at the University of California, testified on behalf of plaintiffs that it was their opinion that a tree falling on the power wires, which then contacted the telephone lines with the protector device, would result in fire to the lodge building; that insulation of the power wires would have reduced the fire hazard; that cable for effective insulation of the tap line where it crossed the telephone wires is commercially available; that if the transformer, which reduced the power to 110 volts from the 11,000 the tap line carried, had been placed south of the highway it would have likewise reduced the fire hazard; and that the circuit breaker at the South Power House could be so adjusted and timed as to cut off power in the event of interference by a tree falling on the wire and coming into contact with the telephone lines.

It is apparent that the evidence above summarized is sufficient to support the jury's implied findings that the falling of the tree brought the defendant's power line into contact with the telephone lines leading into plaintiffs' lodge; that the falling of the tree in a high wind might have been foreseen; that the danger could have been forestalled or alleviated by insulating the tap line wires and by reducing the voltage therein; that the fire resulted from the contact of the high voltage, uninsulated wires with the telephone wires below; that defendant was negligent in the manner in which it erected and maintained and operated the tap line and wires; and that such negligence on the part of defendant was a proximate cause of the fire. It follows that, contrary to defendant's contention, the trial court properly denied defendant's motions for nonsuit and for judgment notwithstanding the verdict.

Principles recently reaffirmed by this court in *Dunn* v. *Pacific Gas & Elec. Co.* (1954), 43 Cal.2d 265, 273 [272 P.2d 745] (quoting from *Polk* v. *City of Los Angeles* (1945), 26 Cal.2d 519, 525 [159 P.2d 931]), are that "On the subject of negligence the standard of care is, that one maintaining wires carrying electricity is required to exercise the care that a person of ordinary prudence would exercise under the

circumstances. Among the circumstances are the well known dangerous character of electricity and the inherent risk of injury to persons or property if it escapes. Hence, the care used must be commensurate with and proportionate to that danger. [Citations.] ██ Specific application of that standard requires that wires carrying electricity must be carefully and properly insulated by those maintaining them at all places where there is reasonable probability of injury to persons or property therefrom. [Citations.]'' ██ Further (quoting from *Lozano* v. *Pacific Gas & Elec. Co.* (1945), 70 Cal.App.2d 415, 422 [161 P.2d 74]), ''The duty of due care with which the company was charged consists not only in the proper installation of the dangerous instrumentality but in the maintenance thereof in a safe condition at all times and places and under the changing circumstances of the particular case. Even if at the outset of the installation of equipment the company may have been entirely free from fault, yet, if, under changing circumstances, a hazardous condition arose, nonaction or the failure to remedy such condition would constitute culpable negligence. [Citations.]'' (P. 274 of 43 Cal.2d.)

██ In *Irelan-Yuba etc. Min. Co.* v. *Pacific Gas & Elec. Co.* (1941), 18 Cal.2d 557, 565-566 [116 P.2d 611], it was held not unreasonable to require the power company to anticipate that during a high wind a tree might fall across high voltage lines and result in a fire; that ''If a tree is in such close proximity to a pole line that wind may cause it to fall across the wires, the failure to provide against such eventuality is negligence''; and that ''It is not decisive that the tree was not within the limits of the portion of the right of way which had been cleared.'' Judgment for plaintiffs, whose property was destroyed, was affirmed. ██ And in *Rocca* v. *Tuolumne County Elec. etc. Co.* (1926), 76 Cal.App. 569, 579 [245 P. 468], and *Smith* v. *San Joaquin etc. Power Corp.* (1922), 59 Cal.App. 647 [211 P. 843], it was held that the power company is not relieved from liability for failure to protect its wires or take the precautions which the circumstances reasonably demand merely because the tree which endangers the wires stands on private property.

██ Defendant's next contention concerns its plea of contributory negligence on the part of plaintiffs. In this connection defendant complains of the refusal of the trial court to permit cross-examination of the witness Harvey Brown, a sawmill proprietor, concerning arrangements with plaintiffs to cut down certain trees on their property. Defendant asserts

that Brown was plaintiffs' agent and that the cross-examination of Brown as to his knowledge concerning the hazardous tree which fell was material and relevant to the question of plaintiffs' contributory negligence, as such knowledge would be imputed to plaintiffs. Defendant points to no evidence, however, which would support its assertion of agency, and it is undisputed that plaintiffs were aware of the existence of the tree and its location with respect to the power and telephone lines. Neither is there any suggestion that Brown or plaintiffs knew of the location of defendant's transformer or were informed concerning the regulation and maintenance of the circuit breaker in defendant's power house. For these, and other reasons more fully discussed hereinafter, defendant's position on this point is untenable.

■ Defendant likewise urges that the trial court erred in taking the issue of contributory negligence from the jury.[2] However, defendant refers to no evidence which would indicate that plaintiffs had knowledge of or could foresee the fire hazard to their property which defendant created by its manner of construction, maintenance and operation of the tap line in proximity to the tree and the telephone wires— a hazard which was shown only through the testimony of expert witnesses at the trial, including that of the electrical engineer who was defendant's former employe—whereas recognition of such hazards may reasonably be held to lie within the expert and specialized knowledge of defendant who constructed the line and upon whom responsibility for its inspection and safe maintenance and operation lies. By contrast, it was shown in *Polk* v. *City of Los Angeles* (1945), *supra,* 26 Cal.2d 519, 524, 529-532, *Benard* v. *Vorlander* (1948), 87 Cal.App.2d 436, 448-449 [197 P.2d 42], and *Rojas* v. *Southern Calif. Edison Co.* (1951), 105 Cal.App.2d 258, 259 [233 P.2d 141], relied upon by defendant, that plaintiffs were aware of the hazards involved. (See also *Prescott* v. *Ralphs Grocery Co.* (1954), 42 Cal.2d 158, 162 [265 P.2d 904].) Under the circumstances here present, defendant has shown no error in withholding from the jury the issue of contributory negligence.

Defendant's next contention is that the trial court erred

---

[2]The jury were instructed: ''The fact that the defendant Pacific Gas and Electric Company, with Plaintiffs Beresfords' consent, constructed its power line across the Beresfords' property does not impose upon the Beresfords the duty to take precautions to avoid future injuries to Beresfords' own property arising from a tree falling into the defendant's power line.''

in admitting, over defendant's objection, testimony of the witnesses Saunders and Pritchett concerning experiments made by them. These witnesses were the two electrical engineers employed at the University of California. Following extensive questioning as to their knowledge of the case, they were permitted to testify concerning their experiments and as to whether power escaping down telephone lines and into a telephone switchboard in the manner shown by the evidence could break down the protective equipment and cause a fire. Each answered in the affirmative. There were seven experiments; testimony as to certain of them was stricken, while that concerning the remainder stayed in the case. Defendant argues that the testimony which was allowed did not meet the necessary standards as to experiments and that it permitted speculation by the jury.

■ Although testimony relative to experiments is primarily addressed to the discretion of the trial court "it must appear that the conditions or circumstances were in general the same in the illustrative case and the case in hand . . . [T]he determination whether the conditions were sufficiently similar to make the experiments of any value in aiding the jury is a matter resting in the sound discretion of the judge." (*People* v. *Mondshine* (1933), 132 Cal.App. 395, 397-398 [22 P.2d 779], quoting from *Guinan* v. *Famous Players-Lasky Corp.* (1929), 267 Mass. 501, 521-522 [167 N.E. 235].)

■ "The conditions surrounding a test or experiment of this nature need not be identical with those existing at the time of the occurrence in question provided there is substantial similarity. (*County of Sonoma* v. *Stofen* (1899), 125 Cal. 32 [57 P. 681].) The admission of such evidence is largely a matter of discretion with the trial court, and such a test is merely a circumstance to be considered in connection with other evidence in the case." (*Ortega* v. *Pacific Greyhound Lines, Inc.* (1937), 20 Cal.App.2d 596, 597-598 [67 P.2d 702].) In *People* v. *Levine* (1890), 85 Cal. 39, 43 [22 P. 969, 24 P. 631], the court commented that "The proof of the result of experiments was equally as open to the defendant as the prosecution; and if other experiments would have shown a different result from that shown by the experiment proved by the prosecution, the defendant had ample opportunity to show the fact. The books are full of authorities sustaining the court in admitting evidence of the result of experiments . . . [The] result [of the experiment in this case] was not conclusive, but a mere circumstance to be considered in connection with the other evidence in

the cause. It was both competent and admissible; its weight was for the jury to determine." And in *County of Sonoma* v. *Stofen* (1899), 125 Cal. 32, 38 [57 P. 681], it was declared that "Experimental evidence in corroboration or disproof depends for its value upon the fact that the experiment has been made when the conditions affecting the result are as near as may be identical with those existing at the time of and operating to produce the particular effect. An absolute identity is, of course, impossible, but a substantial identity must exist to give the evidence value."

Without reciting in detail the evidence concerning the experiments it may simply be noted that they illustrated the effect of excessive voltage on a Kellogg arrester such as that attached to a pine board which constituted the base of the telephone connections in plaintiffs' lodge. Such evidence was offered as an aid to the court and jury in more clearly understanding the technical testimony presented by both sides, and no showing has been made that the court abused its discretion in permitting its introduction.

Defendant's other contentions likewise furnish no ground for reversal. First, no error is shown in admitting the testimony of the two witnesses, Saunders and Pritchett, relative to insulating the tap line, relocating the transformer, and adjustment of the circuit breaker. These two electrical engineers qualified as experts in their field, and defendant's objection that they were not qualified as experts on fire and so should not have been permitted to testify on the subjects mentioned, is without merit. Their testimony concerned the effects of electricity and how it could be more effectively controlled. "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown." (*Lynch* v. *Birdwell* (1955), 44 Cal.2d 839, 849 [285 P.2d 919], quoting from *Huffman* v. *Lindquist* (1951), 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485].) No such abuse is shown here.

Neither is prejudicial error shown in failure to strike the testimony of the witness Eckels, who stated that he was awakened by sparks flying from a switch to which was attached an electric heater, that he was quite sure his telephone line was operating the day before the tree fell, and that it did not operate thereafter until repaired. Even if defendant were

correct in its assertion that the testimony was not shown to be connected with this case, there was much other testimony by other witnesses to the same general effect and no prejudice to defendant appears from Eckels' statements.

Finally, defendant complains that a photograph, introduced by plaintiffs for identification only, was permitted by the court to be taken by the jury and viewed during its deliberations and that defendant's motion for a new trial on this ground should have been granted. Defendant particularly objects that the photograph is "of the butt of an uprooted tree showing a large 'cat face' or fire damaged surface," and that in view of certain testimony that a burn will "shut off circulation to some extent . . . where it was burned . . . Depending on the amount of heat created," permitting the jury to see the photograph prejudiced defendant. The same witness testified, however, that he had examined the tree after it fell, that it had a "small cat face on one side," that it did not "appear to be extremely defective," and that it was "a tree that isn't likely to die because of any disease or defect," and that because of the high winds "I wouldn't say that any tree at Mineral was safe." He also answered "Yes," when asked whether the photograph in question "depicts the cat face to which you referred, particularly pointing to the base of the tree?" Further, the witness identified from a photograph introduced by defendant the portion of the tree upon which there was a cat face, although stating, as he had done with reference to the photograph produced by plaintiffs, that he didn't think "it's a fair representation" of the fallen tree. It is our view that under such circumstances, and in the light of the entire record, any error in permitting the jury to view the questioned photograph did not so prejudice defendant as to result in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Spence, J., and McComb, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.