[Civ. No. 6510.   Fourth Dist.   May 22, 1961.]

RODNEY L. BRALY et al., Appellants, v. MIDVALLEY CHEMICAL COMPANY (a Corporation) et al., Respondents.

Dorsey, Bultman & Bianchi and Longacre & Boyes for Appellants.

Crowe, Mitchell, Hurlbutt & Clevenger, J. Thos. Crowe and McCormick, Barstow, Sheppard & Coyle for Respondents.

GRIFFIN, P. J.—Plaintiffs and appellants, Rodney L. Braly and wife, brought this action against defendants and respondents Midvalley Chemical Company, a corporation (hereinafter referred to as Midvalley), engaged in the business of selling and applying chemical fertilizer; Phillip Hansen and Marvin Shook, president and salesman, respectively, for Midvalley; and Brea Chemicals, Inc., a corporation (hereinafter referred to as Brea) which manufactures chemicals.

In 1955, the plaintiffs farmed a total of 90 acres of land in Tulare County and produced a cotton crop from which they harvested a little more than one bale per acre. Plaintiffs contend that the manner in which defendants applied a quantity of aqua ammonia fertilizer to said lands before the same were planted to cotton prevented plaintiffs from obtaining a larger yield of cotton.

It is conceded that Brea manufactured the fertilizer in question; that the fertilizer was sold to plaintiffs by Midvalley, which also applied the fertilizer to plaintiffs' lands pursuant to an agreement to do so. This application was by a preplanting application generally known and referred to throughout the record as the center-bed injection method.

Plaintiffs and defendants generally concede that the main issue in the case was whether fertilizer burn had occurred causing the claimed damage and partial loss of crop. However,

plaintiffs' fifth amended complaint contained a cause of action for negligence in recommending and applying the fertilizer to plaintiffs' land and a cause of action based upon a warranty theory. A third cause of action was abandoned before trial with prejudice. It was agreed that the action against defendant Hansen might "go out" as a party defendant; that a judgment of nonsuit was entered as to him and that plaintiffs' appeal from the judgment would not involve him.

Plaintiffs introduced evidence including expert testimony to the effect that the cotton crop was damaged by fertilizer burn. Defendants introduced evidence including expert testimony to the effect that the damage was not caused by fertilizer burn but by a fungus plant disease called Rhizoctonia Solani, a fungus condition commonly known as "damp-off." A trial by jury of the issues presented resulted in a verdict for all defendants.

Plaintiffs contend on this appeal: (1) The verdict is not supported by the evidence. (2) It was the result of concealed bias of the jury foreman, a cotton raiser, and his misconduct in relating his personal belief and experiences in reference to the center-bed injection method of fertilization and reading from extracts of a book on the subject (not received in evidence) during the jury's deliberations. (3) The trial court erred in rejecting evidence of a nearby farmer who also used the center-bed injection method. (4) The court erred in refusing to permit the expert witness Schade to testify as to what had caused the damage, since, if allowed to testify, he would have stated that the damage was caused by fertilizer burn. (5) Some reference is made to the claimed prejudicial misconduct of the trial judge.

### I. Sufficiency of the Evidence

The reporter's transcript consists of over 1,300 pages of testimony mainly bearing on evidence pertaining to the claimed partial loss of or damage to plaintiffs' 1954 cotton crop. All of the witnesses qualified to testify in such regard agreed that the aqua ammonia fertilizer in question consists of anhydrous ammonia gas dissolved in water; that all fertilizers are potentially dangerous, but must be used if fertilization of plant life is desired, and that such fertilizers are dangerous to plants if not used properly or if placed in too close proximity to the plants; that aqua ammonia fertilizer is not dangerous as a fertilizer unless it is applied in excessive concentrations and that it is in widespread and general use throughout the San

Joaquin Valley in connection with the production of cotton. The evidence shows that its use is a very valuable factor in producing high yields in California, and, as to its application, liquid fertilizer is applied through a shank that extends down below the surface of the ground and which is pulled along through the ground while the fertilizer escapes through a hole in the bottom of the shank.

Plaintiff Rodney Braly testified that prior to 1955 he had used dry nitrogen fertilizer; that during that year he was contacted by Marvin Shook, a salesman for Midvalley, in reference to sale of aqua ammonia fertilizer for his grain, corn and cotton crops, and that Shook explained the advantages of it, and, relying on Shook's knowledge and experience with it, Braly purchased 100 units per acre for his cotton crop, 50 units to be supplied before planting and 50 units after planting; that early in February 1955 Braly prepared his lands for planting and completed the preparations in March. The grain land had been previously treated. Injection of the fertilizer on the cotton land commenced on March 20, 1955 by one Robert D. Blair, who was the tractor driver. After he had made one round, the shank was lowered from 6 to 8 inches to cause a deeper injection, apparently at Braly's suggestion. The balance of the land was thus fertilized. Thereafter, Braly preirrigated the land after leveling it. Planting was commenced about April 10 on a 14-acre parcel and after planting about 42 acres planting was interrupted by rain and the balance was planted about May 1955 and location of seed was about 6 inches above the point of fertilizer injection.

Braly testified he noticed something wrong after the plants started out of the ground but did not know what it was; that in the latter part of April Shook told Braly that he thought the crop had been burned by the fertilizer and recommended irrigation to leach the fertilizer away and told Braly to keep track of the expense and he would be reimbursed. Shook testified that he did not remember such a conversation because he was not in a position to make such a statement; that he advised Braly to report any complaints to the company; and he and plaintiff were in the field and he showed plaintiff some plants and told him it was "damp-off."

Fourteen acres were replanted and 43 acres were spot-planted. The other portions were finished by May 15. A late harvest resulted in a production of one bale per acre. There was testimony that the normal production should have been

about two bales per acre and that the resulting net loss was $14,737.50, plus additional expenses, totaling $16,650.33.

There is some conflict in the evidence as to whether Shook, who sold the aqua ammonia in question to the plaintiffs, recommended the quantity to be used or the particular manner in which the same was to be applied. On discovery of the condition complained of, both plaintiffs and defendants sought expert assistance for the purpose of ascertaining what was wrong with the cotton plants. Defendants' expert, and chief chemist for a leading laboratory, made a thorough study of the crop on June 10, 1955, and testified that, based upon all the tests he had made, soil samples taken, plant specimens he took, and his analysis of those specimens and comparisons, and based on his experience in cotton plants and diseases and afflictions that poison them, he was of the opinion that the cotton crop on plaintiffs' property suffered from, and the condition was due to, damping-off or the fungus Rhizoctonia Solani, and that there was no damage from fertilizer burn, giving his reasons therefor.

A witness for plaintiffs, manager of a cotton gin, stated that on June 9 he observed cotton plants dying on the property and thought or believed they suffered from fertilizer burn. On June 16, plaintiffs called another chemical laboratory expert to ascertain whether the cotton crop was suffering from a fertilizer burn or something else, and the agronomist for that firm brought soil samples to the laboratory which were tested and he reported that at that time the quantity of nitrogen found in the plaintiffs' lands would not be high enough to damage young cotton plants. Plaintiffs did not call him as their witness. Defendants called him and he testified that it was his belief that a tap root on a cotton plant standing in fertilizer of that concentration would not be affected by it; that the toxic ingredients in aqua ammonia fertilizer would not be present in the type of soil encountered on the plaintiffs' lands for any longer than 10 days or two weeks after the injection of said lands with said fertilizer, and that within said limited period they would have changed over to nitrates, which constitute the plant food.

Shook testified that the condition of the plants he saw was caused by damp-off due to fungus which was in turn caused by weather conditions such as the ground being too cold or unusually damp, and that this was an unusually wet spring. Even Braly testified that the year was wetter than the normal year. One neighbor testified that he ended up with a 25 per

cent loss of plants that year from damp-off. There was evidence that unless an individual saw the plant at the time the symptom was observed or within a short time thereafter, he would be wholly unable to tell what had caused the damage to the plant.

Dr. Duane Mikkelsen, an associate professor at the University of California and teacher of agronomical production courses dealing with cotton, testified that he edited the formula prescribed for the use of aqua ammonia and it was published in pamphlet form for guidance of such chemical companies as Brea, and that these publications were furnished by Brea to Midvalley and they were "sound, reasonable recommendations." He testified generally as to the component parts of such fertilizer and its general effects and purpose and generally described "damping-off" and its effect on plants in general. He stated that such seedling disease is one of the major diseases affecting cotton throughout the cotton belt and no field in a given period of years is completely free of this type of injury and that it is widespread. He then indicated that the fact that aqua ammonia was injected into the center of the beds when the beds were formed was a very dangerous practice and the symptoms stated in a hypothetical question indicated to him that the killing of the plants was due to something toxic in the soil rather than a disease organism. On cross-examination, it appears that he never saw the cotton crop here in question and that he would not have been able to tell whether it was affected with a particular type of fungus on the Braly property unless he saw the plants and made cultures, and that a qualified person who saw the plants and made cultures would be in a better position to tell whether or not the plants were suffering from disease rather than fertilizer burn. He then testified that late planting in a normal year produces less cotton and a very precise timing could make a difference of as much as a bale per acre in production. The record shows that on July 1, after receiving the report of their chemist, plaintiffs ordered and used an additional quantity of the same fertilizer which was then applied on each side but within 7 or 8 inches of their growing plants in a side-dressing application.

Summarizing defendants' evidence, it was sufficient to show, and the jury had the right to believe, even though the evidence was conflicting, that (1) Brea did not exercise any control over Midvalley or its employees; (2) Brea did furnish information and assistance to its dealers concerning its product; (3) such information was sound and reasonable;

(4) plaintiffs were somewhat experienced in the use of ammonia fertilizers; (5) it had widespread use on cotton crops; (6) it was not necessarily any more dangerous than any other fertilizer; (7) all fertilizers can cause damage if improperly or excessively applied; (8) the method of application and the amount of fertilizer to be used were determined by plaintiffs; (9) center-bed injection of fertilizer is a proper method of application; (10) the amount of fertilizer applied was unusually light; (11) plaintiffs' damage was not caused by ammonia gas because none remains in the soil 10 to 14 days after application; (12) tests of plaintiffs' soil and plants were conducted by agricultural chemists in June 1955 and as soon as damage was apparent; (13) chemical analysis proved that the amount of nitrate in the soil was not excessive; (14) the cotton plants themselves did not contain evidence of excessive nitrogen; (15) the plants and roots did not have the appearance of fertilizer burn; (16) root samples collected by plaintiffs were inconsistent with fertilizer burn; (17) chemical tests indicated that plaintiffs' cotton plants were suffering from damping-off fungus; (18) growth of damping-off fungus is promoted during cold, wet weather; (19) about 2 inches of rain fell between April 18 and May 8, 1955, and plaintiff did considerable irrigating during that period; and (20) plaintiffs' yield was reduced by light planting.

██ ██ Although the evidence may have supported a verdict to the contrary, we are here faced with the time-honored rule that in reviewing the evidence, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible; that it is an elementary but often overlooked principal of law that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ██ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Teixeira* v. *Domingos,* 171 Cal. App.2d 196, 200-201 [339 P.2d 863].)

## II. CLAIMED MISCONDUCT OF JURY FOREMAN
### AND CONCEALED BIAS

██ The foreman of the jury, on *voir dire* examination, stated quite frankly that he was a cotton rancher, that he had

dealt with Brea three years before and bought liquid aqua ammonia from it and used it on his cotton crops and that it was injected before planting. He was then asked if his experience in that connection would affect his judgment in the instant case and he replied that he could not see that it would because he had had other companies apply the same type of materials and he was not prejudiced in any way and he believed he could base his decision solely upon what was presented as evidence in the case and the law as given by the court and that he would be fair.

After the verdict was returned against plaintiffs, their counsel obtained affidavits from several of the jurors, prepared by plaintiffs' counsel, stating in effect that in the jury room and during the consideration of the question whether or not fertilizer burn had occurred, the subject of the jury foreman's experience with cotton farming and the use of liquid ammonia fertilizer came up. (Apparently there were two other cotton farmers on the jury.) Some of the jurors asked the foreman about his personal experience and he told them he had used it with center-bed injection. In answer to an inquiry, he stated that he had had no fertilizer burn and his experience was thereafter generally discussed. The jurors stated that it was their belief that his statement had a significant influence on other jurors; that the foreman was positive plaintiffs had not suffered a fertilizer burn and gave his reasons for his belief. Most of these reasons were covered in the evidence produced in the trial. One affidavit related that during the deliberations the jury foreman removed a notebook or booklet from his pocket and read from it certain statements pertaining to center-bed injection of liquid ammonia fertilizer on cotton crops and their increased yield resulting therefrom, and the general tenor of the material was that such method of fertilizer application was a proper and approved practice and that this information was taken from a yearbook put out by ''Washington.''

Counsel for plaintiffs, being familiar with the general rule in reference to impeachment of the verdict of the jurors, made his own affidavit, claiming the jury foreman misrepresented and concealed his true feelings and state of mind in his *voir dire* examination and that he was biased and prejudiced against plaintiffs from the beginning and, accordingly, the case falls within the exceptions noted in *Williams* v. *Bridges,* 140 Cal.App. 537 [35 P.2d 407] ; *Shipley* v. *Permanente Hospital,* 127 Cal.App.2d 417 [274 P.2d 53, 48 A.L.R.2d 964] ;

2 Witkin, California Procedure, pages 1828-1829, section 99, Supplement, pages 160-162. He also claims the court reporter failed to record a certain question propounded to the juror and his answer thereto. There is no proof of this in the record and we are not authorized to rely upon anything but the record certified by the reporter, unless properly corrected. (*Muller* v. *Reagh,* 170 Cal.App.2d 151, 154 [338 P.2d 601].) We see nothing in the *voir dire* examination of the jury foreman that was not a frank statement of facts as to his experience as a cotton grower and its attendant problems, as well as a frank relation of his personal experience with this same form of fertilizer. Many of the facts discussed in the jury room were produced in testimony during the trial and were in conflict. In determining what the true facts are, the jurors are the sole judges and in determining the truth of the testimony they are authorized to call upon their own personal experiences and observations, and these observations, no doubt, are often used in discussions with fellow jurors. Of course, the final determination should be based upon the evidence produced which all the jurors, under oath, agreed to do. It is just to prevent such harassment of jurors and confusion that gives rise to the rule of preventing impeachment of the jury's verdict.

Some criticism might be leveled at the use of documents or writings not used in evidence as a basis for a verdict. There was evidence in the record that would support the writing claimed to have been read to the jurors about the practice of center-bed injection of liquid ammonia fertilizer being an accepted practice, although there is testimony that it was dangerous unless properly applied. We are convinced that the rule announced in *Kollert* v. *Cundiff,* 50 Cal.2d 768, 772 [329 P.2d 897], is here applicable, i.e., that affidavits of jurors may not be used to impeach a verdict. See also *People* v. *Sutic,* 41 Cal.2d 483, 495 [261 P.2d 241] (coercion of a juror by the others to subscribe to a verdict) ; *People* v. *Evans,* 39 Cal.2d 242, 250 [246 P.2d 636] (evidence received out of court) ; *People* v. *Azoff,* 105 Cal. 632 [39 P. 59] (evidence received out of court) ; *People* v. *Zelver,* 135 Cal.App.2d 226, 235 [287 P.2d 183] (juror coerced and intimidated by other jurors) ; *Maffeo* v. *Holmes,* 47 Cal.App.2d 292, 295 [117 P.2d 948] (independent investigations by some jurors) ; *People* v. *Giminiani,* 45 Cal.App.2d 535, 539 [114 P.2d 392] (juror informed by third person that defendant had committed similar offenses). To the same effect are *Dunford* v. *General Water Heater Corp.,*

150 Cal.App.2d 260, 267 [309 P.2d 958], and *People* v. *Webb,* 143 Cal.App.2d 402, 419 [300 P.2d 130]. Furthermore, the trial court fully considered this question on a motion for new trial and denied it.

### III. VERDICT CONTRARY TO INSTRUCTIONS ON LAW

The claim is that since the jurors, as shown by their affidavits, reached a verdict based on independent evidence heard in the jury room, the verdict was contrary to the instructions given them that they must decide the case solely upon the evidence received in court. Since the affidavits may not be used in impeachment of the verdict, there is no merit to this argument.

### IV. EVIDENCE OF SIMILAR EXPERIENCE

Plaintiffs' next complaint is that the trial court erred in refusing to admit evidence of a claimed cotton crop failure of two ranchers several miles distant from plaintiffs' land who used center-bed injection. They cite in support of the admissibility of such testimony *Ritterbusch* v. *City of Pittsburg,* 205 Cal. 84 [269 P. 930, 61 A.L.R. 448] ; *Robinson* v. *Western States Gas etc. Co.,* 184 Cal. 401 [194 P. 39].

The court heard, out of the presence of the jury, a claimed offer of proof which was to this effect:

"MR. LONGACRE: . . . We expect to . . . actually, Horner, Johnson and Braly properties were center bed injected at approximately the same time under almost, so far as I know, the same circumstances. We intend to endeavor to bring in evidence concerning—from Mr. Johnson and others concerning what happened when his property was center bed injected without relation to the other case. In Mr. Horner's case, part was center bed injected and Mr. Horner knew enough to stop them and the remainder of the field was side dressed applied, and we intend to use that to show where it was, we intend to use Mr. Horner to establish direct comparison, the same field, center bed injection again, side bed application. We think it is entirely admissible."

Objection thereto was made by counsel for defendants:

"MR. CROWE: Now, counsel has finally been frank and told the Court what he intends to put in with regard to these other properties. We can't be trying three lawsuits at once. He has explained that he is going over to another property where application may or may not have been the same, and the soil may not have been the same, part was center dressed, part was side dressed, they received this result. He is going to do the

same in that case, and he certainly remembers that we will be able to show that on one portion of the Johnson property where they made a mistake and put on half again as much aqua ammonia, they got the best crop than on any of the rest of the property. We would have to put that in to offset what they are showing on the Horner property. We would be trying three lawsuits at once. It would be unfair. It would expect us to defend three claims when we are defending the claim here of Mr. Braly.''

(In the discussion, it was related to the court that both Johnson and Horner had brought actions against the defendants arising out of the fertilization of their properties with aqua ammonia fertilizer and the court was advised that the action brought by Johnson had been tried and that the jury impaneled to try it had returned a verdict for the defense and that the action brought by Horner had been compromised and settled on a nuisance value basis.)

''. . . Mr. Crowe: I can say that there were many other properties center injected, if you are going to put these in, where claims were made; we would be then entitled to bring in other cases in this general locality where people were delighted with it and still use it. Then where would be the end?''

The trial judge was authorized to reject this offer of proof. (*Decter* v. *Stevenson Properties, Inc.*, 39 Cal.2d 407, 420 [247 P.2d 11]; *Vestal* v. *Young*, 147 Cal. 721 [82 P. 383]; *Douillard* v. *Woodd*, 20 Cal.2d 665, 669-670 [128 P.2d 6]; *Stickel* v. *San Diego Elec. Ry. Co.*, 32 Cal.2d 157 [195 P.2d 416]. He correctly pointed out that plaintiffs' offer of proof had not shown that the conditions (i.e., condition of soil, planting, etc.) on the Johnson and Horner properties were identical; that it took eight days to try the Johnson case and if the issue of that case was injected into the instant case the same amount of time would be consumed in relitigating the same issue; that it would then be proper to show by other witnesses that they used the same fertilizer in the same manner and grew the best crops they ever had and that a retrial of the issues in those cases would result in consuming unnecessary time on collateral issues. In the pretrial order, plaintiffs' counsel estimated only five days of trial for the entire case. Plaintiff took eight days alone in presenting his evidence. The trial commenced on October 1 and ended on October 26. The trial court concluded that this form of evidence would not prove or disprove the issues in the present case. The determination of whether the conditions were sufficiently similar to make the

comparison of any value in aiding the jury was a matter resting in the first place in the sound discretion of the trial judge. (*Beresford* v. *Pacific Gas & Elec. Co.,* 45 Cal.2d 738, 748 [290 P.2d 498, 54 A.L.R.2d 910] ; *Grupe* v. *Glick,* 26 Cal.2d 680, 685 [160 P.2d 832] ; *People* v. *Ely,* 203 Cal. 628, 632 [265 P. 818] ; *Dankert* v. *Lamb Finance Co.,* 146 Cal.App.2d 499, 503 [304 P.2d 199].) ▉ *Moore* v. *Rogers,* 157 Cal.App.2d 192, 197 [320 P.2d 524], states:

"In *Douillard* v. *Woodd,* 20 Cal.2d 665 [128 P.2d 6], the court said: 'A mere general offer of proof without producing the witness or stating the evidence whereby the fact in issue is to be proved, or, if the witness be present, without putting a question to him in such form as to give opportunity for objection, is not correct trial procedure and it affords no ground for appeal.' ▉ An offer of proof must be distinctly directed to some material fact and if it is vague or fails to reveal what facts it is proposed to bring out it is not error for the court to reject it."

Even if admissible to impeach the testimony elicited from Shook on cross-examination, the probative value of this evidence on the question was doubtful. (*Estate of Gird,* 157 Cal. 534, 548 [108 P. 499, 137 Am.St.Rep. 131] ; *Gonzales* v. *Pacific Greyhound Lines,* 34 Cal.2d 749, 754 [214 P.2d 809].)

### V. OPINION EVIDENCE

▉ Next, objection is made to a ruling of the court which plaintiffs claim precluded them from showing, on cross-examination under Code of Civil Procedure, section 2055, that Richard O. Schade, an agronomist for Brea Chemical Company, had an opinion, as an expert, as to the cause of damage to Braly's cotton crop. Schade was assigned by Brea to investigate and make a report in respect to troubles in that area. He testified at length in reference to other matters and gave certain opinions based thereon. Upon being shown the samples, Schade stated that he had never seen anything similar; that he had never seen such damage resulting from damping-off or from fertilizer burn; that he had not observed cotton plants at all past the seedling state; that he didn't know "what caused that specific one." And when asked if the root damage might have been caused by fertilizer burn, the witness said: "It is a possibility, but I have never followed them through that far." Later, when he was asked: "Now, in your opinion would the damage as indicated by these plants be consistent with a fertilizer burn from aqua ammonia fertilizer?" he replied: ". . . I

had never followed any plants that were supposedly burned to a stage of maturity; consequently, I have never seen this particular situation before.'' He also testified that he had not seen the Braly property and was in no position to give an opinion. Prior testimony showed he had looked at and made an investigation of one property in that area and had merely looked at another from the side of the roadway and he could not recall whether either was the property of plaintiffs and he had made no reports on plaintiffs' property. The trial judge was justified, at that stage of the proceedings, to sustain an objection to the question on the ground that no proper foundation had been laid.

Finally, counsel for plaintiffs, in his affidavit, in reference to the motion for a new trial pertaining to claimed misconduct of the foreman of the jury, cast several aspersions which we believe to be unjustifiable. It contained some misstatements of fact in reference to claimed prejudice and alleged misconduct of the trial judge during the trial of the action. Opposing counsel's affidavit, in this respect, strongly refuted such facts alleged as to the claimed misconduct. These accusations bore mainly on the trial judge's endeavor to hurry the trial which was greatly exceeding the time agreed upon because the trial was involving too much detail and immaterial matters. Suffice to say, our examination of the record discloses no prejudicial misconduct or bias on the part of the trial judge pertaining to his rulings and we conclude that plaintiffs had a fair and impartial trial. The court was authorized to deny the motion for new trial.

Judgment affirmed.

Shepard, J., and Coughlin, J., concurred.