[Civ. No. 12061. Fourth Dist., Div. Two. July 18, 1973.]

MARY CATHERINE CULPEPPER, Plaintiff and Respondent, v. VOLKSWAGEN OF AMERICA, INC., Defendant and Appellant.

## Counsel

Gould, Magaram, Riskin, Wayne & Minikes, Morton Minikes and Herzfeld & Rubin for Defendant and Appellant.

Toxey H. Smith for Plaintiff and Respondent.

## Opinion

**KERRIGAN, J.** — The 19-year-old plaintiff sued the defendant Volkswagen of America, Inc. (VWA), the importer of the Volkswagen, to recover damages for severe personal injuries sustained in a single-car automobile accident which occurred about 10 a.m. on December 19, 1968, on the Riverside Freeway in Orange County when the 1966 Volkswagen she was driving rolled over when she attempted a lane change maneuver.[1] Plaintiff claimed that the car was defectively designed and the case was submitted to the jury on the theory of strict liability in tort.[2] The jury returned a verdict for $75,000 and VWA's motions for judgment notwithstanding the verdict and for a new trial were denied.

VWA maintains on appeal that the plaintiff failed to establish that the car was defectively designed or that the alleged defect was the proximate cause of the accident, and that the trial court committed prejudicial error in admitting and rejecting certain expert and demonstrative evidence.

The subject automobile is a 1966 VW Type 1 Bug which was imported to this country from West Germany by the defendant and was sold to Volkswagen Pacific, Inc., the west coast distributor for Volkswagen automobiles. Volkswagen Pacific sold it to Lee Wood Motors, a franchised

---

[1]Plaintiff's complaint also named Volkswagen Pacific, Inc., the west coast distributor of the automobile, and Meltebeke VW, the seller of plaintiff's VW, as parties defendant. During trial, plaintiff dismissed the action as to these defendants.

[2]The complaint was predicated on the basis of negligence and breach of warranty but the negligence theory was abandoned.

dealer. It was purchased by a private buyer who sold it to Meltebeke VW in 1967. In March 1968, plaintiff purchased the car from Meltebeke. At the time of the accident, the car was over two years old.

The accident occurred in the westbound lanes of the Riverside Freeway between the Lemon Street overcrossing and the Harbor Boulevard off-ramp. The eastbound and westbound traffic lanes are separated by a center divider guard rail constructed of galvanized steel. There are three westbound traffic lanes, each being 12 feet in width. There is also a six-foot asphalt shoulder separating the center divider from the fast westbound lane (lane No. 1).

Plaintiff's testimony may be summarized as follows: She entered the Riverside Freeway from the Newport Freeway; her destination was Harbor Boulevard; she was traveling in the middle lane—No. 2 lane—at a speed of approximately 50-55 miles per hour; as she approached the Harbor Boulevard off-ramp, she started to move into the lane to her right—No. 3 lane—when she heard a honk; she looked over her right shoulder and she saw a truck behind her in lane No. 3; the truck was fast approaching her; she became frightened and turned the steering wheel sharply to the left to get back into the middle lane; she then tried to straighten the car out by turning to the right but she got no response from the maneuver; her car then started to roll over; she was thrown out of the car to the pavement.

The truck driver operating the van behind the plaintiff gave the following version of the accident to the investigating California Highway Patrol officer: He was in the No. 3 lane (slow lane) and plaintiff was in the No. 2 lane (middle lane); she almost drove into the side of his van when she attempted a lane change so he honked his horn; the girl looked back at him and turned her steering wheel to the left and then right and the VW turned over and the girl was thrown out onto the road.

The truck driver's testimony at the time of trial was at variance with the statement he gave the investigating patrolman at the scene. His trial testimony took the following form: When he first observed the plaintiff, he was in the middle lane (No. 2 lane) and she was in the fast lane next to the center divider (No. 1 lane); he was going 65 miles per hour and was closing in on the VW which was going about 50-55 miles per hour; the car started to make a normal turn to go into his lane; when she was halfway into the No. 2 lane, she looked out the back window and saw his truck; she turned her steering wheel sharply to the left; she then attempted to straighten out the car by turning to the right; as he passed the VW, he

heard a crash noise to the left of his truck and first thought that the plaintiff had hit his truck; he looked through the inside rear view mirror and observed the VW rolling over as it went down the freeway.

The physical evidence indicates that the car came to rest right side up between the No. 2 and No. 3 lanes past the Harbor Boulevard off-ramp. Broken glass was found in the No. 2 and 3 lanes midway between the Lemon Street overcrossing and the point where the car came to rest. No skid or other marks or obstructions were observed on the freeway surface in the vicinity where the accident occurred. The right side of the car was not damaged whereas the left side sustained heavy damage, and the car was adjudged a total loss.

Plaintiff's expert witness, Paul O'Shea, former professional race car driver and presently an automotive research consultant, testified to the following effect: The VW would roll over on a flat paved surface, such as a freeway, street or highway, without being "tripped";[3] American cars, with certain exceptions such as Corvair, would not do this; in the United States, there is an implied standard that a car should not roll over on a smooth surface; plaintiff's turning the wheel right, then hard left, then right again caused her VW to roll; the 1966 VW is of an unsafe design insofar as its roll-over characteristics are concerned; by reason of the design of the VW rear suspension system, it has a propensity to turn over when the front wheels are turned 18 degrees at a speed of 42 miles per hour; he had conducted certain tests to determine whether a car will roll over and had rolled a VW himself; additionally, he had conducted tests using mechanical devices instead of a driver in order to eliminate human error for the purpose of determining if a 1966 VW would roll and it did roll; the mechanical test is known as the Bungee Cord Experiment.[4]

Over defense counsel's objection, a film depicting the Bungee Cord Experiment of the 1966 VW was exhibited to the jury. It depicts several

---

[3]"Tripping" occurs when the acceleration of the lower part of the vehicle is stopped considerably faster than the upper portion of the vehicle. Accordingly, a car may be "tripped" if it hits a large hole in the road surface, hits a soft dirt shoulder, or strikes a curb.

[4]In the Bungee Cord Experiment, a cable is attached to the car and it is wrapped around a hub device affixed to the steering wheel; the cable then runs to a pulley on the passenger's side, then back into a box containing the bungee cords—these are giant rubber bands in a stretched position; a pin is then inserted to hold the bungee cords taut; a lanyard is attached to the car from a tow truck; the truck then pulls the driverless car, with its engine off and its gear in neutral, to a certain speed at which point the lanyard is released; the disengaging of the lanyard causes the pin holding the bungee cords to be released also; when the pin is released, the bungee cords retract—like a rubber band—thereby turning the steering wheel far enough to impart certain fixed degrees of turn to the front wheels.

"runs" at various speeds of a driverless 1966 VW, with its engine off and its gear in neutral, being towed by another vehicle; when the VW reached a certain speed, a mechanical device called a bungee cord turned the steering wheel several different degrees; when the front wheels were turned 18 degrees at a speed of 42 miles per hour, the car rolled over.

In an endeavor to establish that the 1966 VW was not defectively designed, defendant produced Erich Unterreiner, a test engineer for Volkswagenwerk AG, the manufacturer of Volkswagen automobiles. His testimony may be summarized as follows: The VW is not defectively designed and does not have a propensity to roll over when the front wheels are turned 18 degrees at a speed of 42 miles per hour on a smooth surface; it will roll over only if it is "tripped"—hits a rut in the road, a curb or a soft dirt shoulder; the VW front wheels turn from straight ahead to left or right a maximum of 32 degrees; to turn the front wheels 18 degrees, the steering wheel must be turned 270 degrees; he could not conceive of any situation or emergency which could occur that would make him turn the steering wheel more than a quarter turn; a quarter turn of the steering wheel at 42 miles per hour would produce a 4-6 degree turn of the front wheels; he considered any turn of the steering wheel more than a quarter turn to be a suicidal maneuver; however, he conceded that VW purchasers were not warned that they were never to turn the steering wheel more than a quarter turn; stated succinctly, his testimony was that it would be unreasonable for a driver to turn the front wheels more than 6 degrees at 42 miles per hour.

VW was also permitted to show a motion picture film of a 1966 VW being driven by a professional race car driver. In addition to being permitted to show the film, VW's test driver testified that he put the VW and Ford Pinto through similar basic maneuvers, such as passing maneuvers on the freeway, at speeds of 40, 50 and 60 miles per hour, and through a series of evasive maneuvers at speeds of 50, 55 and 60 miles per hour to demonstrate the driving and handling characteristics of the car on approaching an obstacle suddenly appearing in the roadway; based upon the results of the tests depicted in the film, VW's driver was of the opinion that the 1966 VW was a better handling car in that the driver had more control over the vehicle than the driver of the Pinto.

Another film was introduced by the defense depicting a 1966 VW's driving characteristics in comparison to several American cars (Gremlin, Barracuda, Tempest and Pinto). This film reflects that the VW and the American cars were put through several evasive emergency maneuvers and indicates that in undergoing severe movements, the American cars would roll over on a flat surface without being tripped.

■ Turning to the issues on appeal, defendant maintains that the plaintiff failed to sustain her burden of proof that the 1966 VW was defectively designed or that the alleged defect was the proximate cause of the accident. In other words, defendant is asserting that as a matter of law plaintiff failed to establish strict liability or proximate cause.

### DEFECTIVE DESIGN

In *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], the Supreme Court held that a manufacturer may be held strictly liable in tort if the product he places on the market proves to have a defect in its design or a defect in its manufacture which makes it unsafe for its intended use. The strict liability rule is also applicable to the distributor and retailer of the defective product. (*Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 263 [37 Cal. Rptr. 896, 391 P.2d 168]; *Barth* v. *B. F. Goodrich Tire Co.*, 265 Cal.App. 2d 228, 252-253 [71 Cal.Rptr. 306].)

VWA concedes the existence of the rule and the tort liability of the manufacturer, wholesaler, distributor and retailer of the defective product. However, it claims that the word "defect" is not capable of precise definition in all cases and that merely because a VW will roll over under extreme conditions does not prove that it is defectively designed.

In *Jiminez* v. *Sears, Roebuck & Co.*, 4 Cal.3d 379 [93 Cal.Rptr. 769, 482 P.2d 681], the Supreme Court conceded that the term "defect" is incapable of simple definition when it said: "A defect may be variously defined, and as yet no definition has been formulated that would resolve all cases or that is universally agreed upon. . . . In *Greenman, Vandermark* . . . and *Elmore* v. *American Motors Corp.*, 70 Cal.2d 578 . . . , a defective product is viewed as one which fails to match the quality of most like products, and the manufacturer is then liable for injuries resulting from deviations from the norm: the lathe did not like other lathes have a proper fastening device, the brakes of the automobile went on unexpectedly, the drive shaft of a new car became disconnected. [¶] The deviation-from-the-norm test does not provide a solution for all cases. It may be over inclusive, or it may be under inclusive, and it has been suggested that liability might be imposed as to products whose norm is danger. (See Traynor, *The Ways and Meanings of Defective Products and Strict Liability* . . . 32 Tenn.L.Rev. 363, 367 et seq.)" (P. 383.)

VWA maintains that inasmuch as there was evidence that American cars of the same size and weight as the VW sometimes roll, the issue is whether VW's design created a dangerous handling characteristic in the

ranges of driving conditions and circumstances that could be reasonably anticipated by the designers and engineers of the car. VWA then argues that turning of the front wheels 18 degrees at a speed of 42 miles per hour on a freeway is fraught with danger—in the words of the German engineer —a suicidal maneuver.

VWA's argument ignores its own test. Although there was evidence that the VW's handling characteristics were good, it cannot be said as a matter of law that within the normal range of driving conditions and circumstances its engineers could not reasonably anticipate that a driver would be required to turn the front wheels 18 degrees at a speed of 42 miles per hour or at a speed of 55 miles per hour. Emergency situations requiring severe turning movements arise every day. Cars should not be built just to coincide with normal driving conditions. While the car, driver and road are all interrelated, situations of peril do arise daily requiring heroic turning maneuvers. While strict liability should not be imposed upon the manufacturer (or distributor) when injury results from the use of its product that is not reasonably foreseeable, and while a *collision* may not be the normal or intended use of a vehicle, vehicle manufacturers must take *accidents* into consideration as reasonably foreseeable occurrences involving their products. (*Cronin* v. *J.B.E. Olson Corp.*, 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153].) If manufacturers must take *accidents* into consideration in designing their products, then similarly automobile engineers and designers should reasonably foresee that a turn of the front wheels of a car 18 degrees may be necessitated in a variety of *emergency* situations at a wide range of speeds.

There was evidence produced by plaintiff, through expert O'Shea, to the effect that there is an implied standard that a car should not roll over on a smooth surface at any speed regardless of how much the driver turns the front wheels; based upon this opinion, O'Shea concluded that any car that will roll over on a flat, smooth road is defectively designed. While O'Shea's opinion may or may not be absolutely valid, the jury could reasonably conclude that no car, American or foreign, should roll over on a smooth surface at a speed of 50-55 miles per hour based on the turning maneuver that the plaintiff made in this case. Plaintiff may or may not have turned 18 degrees, but her act in turning the wheel sharply to avoid a perilous situation was not an uncommon occurrence and the jury could certainly have determined that it was a foreseeable factor the VW designers should have considered in designing the car.

## PROXIMATE CAUSE

VWA next maintains that the doctrine of strict liability does not

impose absolute liability, and not only must the plaintiff establish that its vehicle was defective, but that there was a causal relationship between the defect and the resulting injury. (See *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578, 584 [75 Cal.Rptr. 652, 451 P.2d 84]; *Romig* v. *Goodyear Tire & Rubber Co.,* 271 Cal.App.2d 420, 421-422 [76 Cal.Rptr. 479]; *Greening* v. *General Air-Conditioning Corp.,* 233 Cal.App.2d 545, 549 [43 Cal.Rptr. 662].)

VWA is correct in arguing that strict liability is not absolute liability. Plaintiff has the burden of introducing either some direct evidence of the defective nature of the vehicle or some circumstantial evidence from which the jury may reasonably infer the existence of the defect; plaintiff does not make a prima facie case by simply showing that she was injured and that the car merchandised by the defendant was involved in the injury; were this the case, the liability would be absolute; it is a relatively rare injury where some sort of chattel is not involved in some way; therefore, the plaintiff must not only introduce evidence as to the defect but also evidence that such defect proximately caused the injury. (Lascher, *Strict Liability in Tort for Defective Products: The Road To and Past Vandermark* (1965) 38 So.Cal.L.Rev. 30, 51-52.)

The question naturally arises whether there was substantial evidence that the defective VW caused the accident or whether the roll-over was caused by some intervening force or conduct on the part of plaintiff.

In order to turn a VW's front wheels 18 degrees, the steering wheel must be turned 270 degrees when traveling at a speed of 42 miles per hour. Here there was evidence from the truck driver following the plaintiff (as well as the plaintiff herself) that she turned the steering wheel hard to the left just before the vehicle started to roll. Absent any proof that the plaintiff's vehicle went out of control for any other reason than the turning maneuver (such as striking the center divider (*infra*)), the factor of proximate cause was established.

### EXCLUSION OF TESTIMONY

VWA next maintains that the trial court committed reversible error in excluding evidence of paint scrapings taken from the center divider guard rail of the freeway near the scene of the accident for the purpose of showing that the paint on the guard rail matched the paint of the plaintiff's VW.

In an attempt to explain how the accident occurred, defendant presented the testimony of Arnold J. Siegel, an expert in automobile acci-

dent reconstruction. He testified that based upon his review and analysis of the police report of the accident, statements that were taken from witnesses, his own interviews with the truck driver and the investigating police officer, a reading of the depositions and interrogatories, a study of the survey maps of the accident scene and area, photos of plaintiff's car taken after the accident, comparison of the height of the VW in relation to the center divider guard rail, and his own observations of the accident scene, it was his opinion that plaintiff's car rolled over because it struck the center divider guard rail.

VWA later called Dr. Butler, a specialist in the field of metallurgical engineering—an expert in analyzing paints and paint transfers—and an offer of proof was made outside the presence of the jury that Butler would testify to the following effect: The witness had taken certain paint scrapings from the center divider guard rail in the vicinity where the accident occurred and would testify that the scrapings would match the color of plaintiff's Volkswagen; plaintiff's VW was painted a standard factory color called "Seasand"; the guard rail had not been repaired or replaced between the time of the accident and date of trial; he took nine paint samples off the center divider rail in the vicinity where the accident occurred; a comparison of the 1966 VW's Seasand paint and the paint scrapings taken from the center divider guard rail showed that some of the samples matched.

While the court could have admitted the evidence of the paint samplings, we cannot hold it erred as a matter of law in refusing the offer. VWA could not sustain its burden of showing that the paint scrapings taken from the guard rail matched *plaintiff's* VW. Defendant called four witnesses from the Division of Highways. None was able to confirm when or how the numerous paint scrapings on the rail got there. Butler himself testified that he could not flatly state that the multiple paint samples removed from the guard rail matched the *plaintiff's* vehicle inasmuch as he had not obtained the samples until some *three years* after the subject accident.

Consequently, the trial court did not abuse its discretion in ruling that there had not been a proper foundation for the admission of the paint scrapings. The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice, confuse the issues or mislead the jury. (Evid. Code, § 352.) The offered evidence was speculative, conjectural and remote in nature and could well have confused the jury.

### EXPERIMENTAL EVIDENCE

 VWA finally maintains that the trial court committed serious error in admitting evidence of the O'Shea Bungee Cord Experiment because

plaintiff failed to demonstrate similarity of conditions and circumstances to those involved in this accident.

Prior to admitting the film of the Bungee Cord Experiment into evidence, an extensive *in camera* hearing was held. O'Shea was extensively examined and cross-examined by three defense lawyers. Defense counsel were allowed to review the film and argue the matter and after all the foundational evidence had been introduced, the court admitted the film in evidence. O'Shea testified that the purpose of the test was to have a fixed steer put into the vehicle rather than relying on the human driver and to find out at what point the 1966 VW would roll over.

The film demonstrates the speed and turning maneuver at which a Corvair and a 1966 VW would roll. As previously discussed, the test consisted of putting a mechanical device in a car so as to cause it to make a sharp turn. The film first depicts a truck towing the Corvair and letting it go at 35 miles per hour and then at higher speeds. The same device was put in a 1966 VW; it was towed at 35 miles per hour, 40 miles per hour and 42 miles per hour; in the last run of the 1966 VW at 42 miles per hour, the VW rolled over.

In the field of products liability, the problem of admitting experimental evidence is a very real one; attorneys on both sides must rely upon expert testimony and accident reconstruction experimentation; that is particularly true where causation is a major issue. (Cotchett, *Experimental Evidence in Products Liability,* 44 State Bar J. 866.)

■ Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant (Evid. Code, § § 210, 351); (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence (*Andrews* v. *Barker Brothers Corp.,* 267 Cal.App.2d 530, 537 [73 Cal.Rptr. 284]); and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury (*Schauf* v. *Southern Cal. Edison Co.,* 243 Cal.App.2d 450, 455 [52 Cal.Rptr. 518]).

■ In the case of experimental evidence, the preliminary fact (see Evid. Code, § 403, subd. (a) (1)) necessary to support its relevancy is that the experiment was conducted under the same or similar conditions as those existing when the accident took place. The standard that must be met in determining whether the proponent of the experiment has met the burden of proof of establishing the preliminary fact essential to the admissibility of the experimental evidence is whether the conditions were substantially identical, not absolutely identical. (*Beresford* v. *Pacific Gas & Elec. Co.,* 45 Cal.2d 738, 749 [290 P.2d 498, 54 A.L.R.2d 910].)

In determining relevancy, the question is whether the experiment has any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210; *Holling* v. *Chandler,* 241 Cal.App.2d 19, 23 [50 Cal.Rptr. 219].) Demonstrative evidence has been allowed in federal courts in order to illustrate the principles involved in determining whether a defect exists and to help the jury understand the expert's testimony, *without* the California requirement that the test be conducted under substantially similar conditions. (See *Millers' Nat. Ins. Co., Chicago, Ill.* v. *Wichita Flour M. Co.,* 257 F.2d 93, 99.)

 Evidence of experimental tests should likewise be admissible in California courts in products liability cases as an aid to the fact-finder, provided the trial judge finds the statutory criteria exist. (*Beresford* v. *Pacific Gas & Elec. Co., supra,* 45 Cal.2d 738, 748.) Under section 352 of the Evidence Code, the trial judge has almost total discretion in admitting the results of demonstrations, experiments and tests, and his decision in this area will only be reversed when it is clearly abused. (*Grupe* v. *Glick,* 26 Cal.2d 680, 685 [160 P.2d 832].)

Here, the main issue in the lawsuit involved the capability of the VW to hold the road when the front wheels were subjected to a sharp turning maneuver. Although the Corvair-VW test involved a driverless car, the driver was omitted to eliminate the human error factor. The test was conducted on a dry, flat, smooth-surfaced road—the exact kind of surface as that involved at the accident scene. Consequently, the trial court acted with propriety in admitting the film.

Finally, it should be noted that the court permitted VWA to introduce at least four films depicting tests conducted by the VW manufacturer and that these tests were not offered for the purpose of showing the exact circumstances and conditions which existed in this accident case but for demonstrative purposes. Without detailing each of the films introduced by the defendant, suffice it to say at least one of them compared maneuvers between a 1966 VW and a 1972 Pinto on a freeway, notwithstanding the fact that the Pinto and VW were equipped with a device called an outrigger and the plaintiff's VW was certainly not equipped with an outrigger. Notwithstanding the outrigger discrepancy, the trial judge correctly believed the films would be of assistance to the jury in deciding the liability issue.

The judgment is affirmed.

Gardner, P. J., and Tamura, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 19, 1973.