UNITED STATES of America, Plaintiff–Appellant,

v.

4.0 ACRES OF LAND, more or less, situated in the City of Tucson, Pima County, State of Arizona, Defendant,

and

Allan J. Norville; Alfena A. Norville, wife, Defendants–Appellees.

No. 98–15144.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1999.

Decided May 4, 1999.

Jeffrey C. Dobbins, United States Department of Justice, Washington, D.C., for the plaintiff-appellant.

C. Lawrence Schubart, Stubbs & Schubart, Tucson, Arizona, for the defendants-appellees.

Before: FLETCHER and TASHIMA, Circuit Judges, and FITZGERALD,[2] District Judge.

FLETCHER, Circuit Judge:

Allan J. Norville, a property owner in Tucson, Arizona, sought just compensation for his land that the United States condemned for a new federal courthouse building. After the first jury awarded $2.5 million, the district court granted Norville's motion for a new trial.

Upon retrial, the second jury returned a verdict of $8.4 million. On appeal, the United States asserts that the original jury verdict should not have been set aside and that the court's evidentiary rulings in the second trial deprived the jury of key information necessary to determine just com-

---

**2.** The Honorable James M. Fitzgerald, United States Senior District Judge, District of Alaska, sitting by designation on the Court of Appeals.

pensation. We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude that the district court erred in granting a new trial; we reinstate the original jury verdict.

## FACTUAL and PROCEDURAL BACKGROUND

Developer Allan J. Norville ("Norville") owns 11 acres of land on the west side of downtown Tucson, Arizona. In 1994, the General Services Administration identified the four-acre northwest corner of Norville's 11–acre property for a new federal courthouse. Located at the corner of Congress and Granada Streets, the property is five blocks from the existing courthouse, and is vacant except for a parking lot on one portion and temporary structures that Norville constructed for an annual gem show that he hosts. It has water, electricity, and multiple phone lines that Norville installed. The United States condemned the land in October 1995 and estimated its value at $1,933,000. Norville objected to the valuation and sought a jury trial to determine the appropriate compensation.[3]

### 1. The First Trial

A nine-day jury trial occurred in February, 1997. The parties stipulated that Norville's "larger parcel" consisted of 11.3 acres, rounded to 475,050 square feet and that the land condemned for the courthouse was four acres, or 300,800 square feet.[4] The "just compensation" figure in this case is the difference in the value of the 11–acre parcel "before" the taking and the remaining seven-acre parcel "after" the taking. To determine just compensation, the appraisers estimated a price-per-square foot "before" the taking for the larger, 11–acre parcel, and a price-per-square foot "after" the taking for the remaining seven-acre parcel.

The parties differed in their opinions of the highest and best use of the property before and after the taking. Relying on the property's potential for development as a hotel, retail shops, and exhibition hall, Norville claimed that just compensation exceeded $14 million. His appraisers calculated the value of the original eleven acre parcel, projected to be built out with a 500–room hotel and 50,000 square foot exhibition hall, at $38 per square foot before the taking. Because they forecast that the only reasonable use of the seven acres remaining after the condemnation would be for overflow parking or an unidentifiable investment for some unknown future use, they estimated a value of $11.94 per square foot after the taking. These computations resulted in "just compensation" of $14,460,348.

The government's appraiser, William Peterson, estimated just compensation at $3.2 million, using a value of $10.75 per square foot ($5,107,000) before the taking and $6.99 per square foot ($2,105,000) for the remaining property after the taking. He testified that holding the property for future investment was the highest and best use of the property because there was no current demand in Tucson for a high-rise hotel or retail space.

In addition to its own in-house appraiser, the government relied on Gene Dilmore ("Dilmore"), an independent appraiser, as a rebuttal witness. Dilmore had developed a widely used computer program for making density adjustments to the comparable sales that are used to derive accurate valuations for a subject property. Dilmore testified that Norville's appraisers had erred in their density adjustments to comparable sales, resulting in an inflated valuation for Norville's property.[5] Using the

---

3. Appropriate compensation may be determined by a jury or based on the report of a three-member commission appointed by the district court pursuant to Fed.R.Civ.P. 71A(h).

4. The parties agreed to these estimates of square footage and these numbers were used on the verdict forms in both trials.

5. Density adjustments are used when comparing the sales prices of land and buildings of different sizes.

same comparables and other assumptions as those used by Norville's appraisers, but properly corrected for density adjustments, Dilmore testified that their data would yield a just compensation value of $12.46 per square foot, or $1.4 million.

Dilmore emphasized that he was "not attempting to appraise the subject property" but that his analysis established "that the proper application of size adjustments to the proper pricing unit square foot of building built or allowable, whether using [Norville's appraisers'] sales as is, or as modified in the Corbett report, gives results extremely different from those in [Norville's appraisers'] report." The role of Dilmore's testimony has some bearing on whether competent evidence supported the jury's verdict and whether the verdict was outside the range of the evidence.

The government also called Susan Corbett ("Corbett"), another appraiser, as a rebuttal witness. Corbett testified that Norville's appraisers generated inflated valuations because they erred in their choice of comparables. Using the comparables that Corbett recommended, Dilmore derived a value of $8.04 per square foot. Corbett also testified that, although there was no significant change in the market over the last several years, Norville's appraisers had previously appraised the same property in 1990 and 1992, and estimated values of $10.68—$14 per square foot, substantially lower than the $38 value they testified to at trial.

The jurors also heard Norville testify that he did not want to lose any of his land and that he "never wanted the courthouse on my property." To impeach Norville on this point, the United States called the Hon. William D. Browning, a district judge in Tucson, who had been the Chief Judge

in 1993, and the judge responsible for overseeing plans for the new courthouse.[6] Norville insists that Judge Browning's appearance and testimony were unfair.

Judge Browning testified that Norville contacted him in 1993, before Norville's property was selected for the courthouse, and suggested that the new courthouse should be built on his land. According to Judge Browning, Norville suggested that he would build a hotel next to the courthouse that would share a garage with the courthouse. Norville declined to cross-examine Judge Browning. In addition to Judge Browning's testimony countering Norville's purported desire not to have the courthouse on his property, the government played a videotape showing Norville testifying to the County Council in 1996 about a project on his land that would include the courthouse.

A jury awarded "just compensation" of $2,526,625,[7] which reflected a valuation of $6,888,225 ($14.50 per square foot) "before" the taking and $4,361,600 ($14.50 per square foot) for the remaining property "after" the taking. The jury award was lower than the government's appraisal but higher than the $1.4 million estimate that Dilmore derived using Norville's numbers adjusted for density. When the award is parsed on a per square foot basis, the "before" valuation falls between the values offered by the government and Norville, whereas the "after" valuation is higher than either party suggested. The jury apparently disagreed with the appraisers that the remaining seven acres would decline in value after condemnation and, therefore, declined to award "severance" damages. Norville insists that the jury's failure to award severance damages justified a new trial.

---

**6.** Before allowing Judge Browning to testify, the district court allowed the parties to brief the issue of whether Judge Browning should be allowed to testify and to conduct voir dire of Judge Browning.

**7.** The total jury award was $2,702,625, which included $160,000 for the value of site im-

provements and $16,000 for a "temporary take," the rental value of the property taken before the title transferred. The parties stipulated to these amounts, which remained unchanged in each trial. Thus, only the "just compensation" figures for the land itself are used for comparison here.

### 2. Post–Trial Motions

After the jury announced its verdict, a newspaper article appeared in the *Arizona Daily Star* on March 1, 1997. The article quoted a juror who explained that Judge Browning's testimony convincingly undermined Norville's assertion that he never wanted the courthouse on his property.

Norville, dissatisfied with the jury award, filed a motion for new trial pursuant to Fed.R.Civ.P. 59, alleging that the verdict was (1) against the weight of the evidence because it was outside the range of qualified opinion testimony and failed to award severance damages; (2) the product of prejudice or tainted by the misconduct of counsel; (3) the product of inadmissible and/or overwhelmingly prejudicial testimony by Judge Browning and testimony concerning certain comparable sales; and (4) that the verdict unjustly deprived Norville of "full and fair" just compensation. After hearing, the district court granted Norville's motion for a new trial.

The judge concluded that the verdict was "against the weight of the evidence" because he thought that the verdict was "outside the range of the testimony in evidence is not supported and that the— fact that there was no severance damage given, I think that is overwhelming." The judge also commented that

> I am deeply disturbed [about] the effect of Judge Browning's testimony. I feel I was err [sic] in that and it's difficult for me to admit that I was in error but when I heard the way the evidence was used and the testimony was used, the fact that he hadn't been disclosed as a witness in advance ... I feel that that was a err [sic] on the Court in allowing that testimony in.

The source of the judge's discomfort appeared to be the newspaper article that appeared shortly before Norville filed his motion for a new trial, as the judge said that "the only thing I know about the post verdict was the newspaper article that I read. And in that one of the jurors said that they gave overwhelming weight to Judge Browning's testimony."

In addition to expressing concerns about Judge Browning's testimony, the judge added that "I don't feel that ... Mr. Dilmore's testimony supports the verdict because he was not offering anything with respect to value. It was [a] non-opinion as to value." Together, those factors apparently convinced the court that the verdict was "against the weight of the evidence" and a "miscarriage of justice" and required a new trial.

The United States filed a motion urging the court to reconsider its decision to grant a new trial. The government also offered to consent to an additur of $475,375, raising the total compensation to $3,178,000,[8] the value provided by its appraiser, Mr. Peterson. The district court denied its motion.

### 3. The Second Trial

Before the second trial commenced, the district court granted Norville's in limine motion to exclude Judge Browning's testimony and any reference, by any witness, to Norville's discussions with Judge Browning. The court also excluded Corbett's testimony. Her testimony would have rebutted the testimony of Norville's appraisers.

For the second trial, Norville hired two new appraisers, Herbert Havins and Donald Duncan. Havens appraised the property at $28 per square foot before the taking and $12 per square foot after the taking, making just compensation, $9,691,800. Duncan also appraised the property at $28 before, but only $8 after, making just compensation, $10,895,000. The government introduced the appraisal of Jay

---

8. The $3,178,000 reflects Peterson's condemnation value of $3,002,000 plus the stipulated values of $176,000 for site improvements and rental value. The jury verdict of $2,702,625 plus the government's proposed additur would rise Norville's total compensation to $3,178,000, the total value that Peterson testified to at trial.

Vance who testified that the "before" value was $9 per square foot and the "after" value was $7.50, making just compensation $1.9 million. The second jury awarded $8,213,000 as just compensation.[9] The United States timely appealed the court's decision to grant a new trial following the first trial and challenged the court's evidentiary rulings in the second trial.

## STANDARD OF REVIEW

■ We review for an abuse of discretion a district court's grant of a new trial. *Anheuser–Busch v. Natural Bev. Distributors*, 69 F.3d 337, 346 (9th Cir.1995); *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir.1990), *amended*, 920 F.2d 618 (1991). The trial court may grant a new trial, even though the verdict is supported by substantial evidence, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1452 (9th Cir.1988). We must uphold the district court if any of its grounds for granting a new trial are reasonable. *Id.* The corollary, of course, is that a district court may not grant or deny a new trial merely because it would have arrived at a different verdict. *Wilhelm v. Associated Container Transp. (Australia) Ltd.*, 648 F.2d 1197, 1198 (9th Cir.1981). Thus, we may find that a district court abused its discretion in ordering a new trial if the jury's verdict is not against the clear weight of the evidence. *Roy*, 896 F.2d at 1176.

■ We also review for abuse of discretion a district court's decision to exclude expert testimony. *McKendall v. Crown Control Corp.*, 122 F.3d 803, 805 (9th Cir. 1997). In this case, however, we need not rule on whether evidence was properly excluded in the second trial because we

hold that the district court abused its discretion in granting the second trial.

## ANALYSIS

### 1. Just Compensation

■ Under the Fifth Amendment of the Constitution, the government may not take private property for public use without paying "just compensation" to the owner. U.S. CONST. amend. V. Where the taking is a partial taking, "just compensation" is the difference between the fair market value of the whole parcel immediately before the taking and the remainder after the taking. *See United States v. Miller*, 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943). A "partial taking" occurs where, as here, the government condemns only a portion of the landowner's property. *Id.* ("the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract."); *see also* 71 Nichols on Eminent Domain § 12.03. If the value of the remaining land, on a unit basis, diminishes when the condemned parcel is removed from the larger whole, the landowner is entitled to compensation "both for that which is physically appropriated and for the diminution in value to the non-condemned property." *U.S. v. 33.5 Acres, Okanogan County*, 789 F.2d 1396, 1398 (9th Cir.1986). The diminution in value of the remaining property is called "severance damages." *Id. See also, Miller*, 317 U.S. at 376. Alternatively, if the taking benefits the remainder, "the benefit may be set off against the value of the land taken." *Miller*, 317 at 376.

■ A condemnation action awards "just compensation" to the property owner whose property has been taken by the government. *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); *McCandless v. United States*, 298 U.S. 342, 348, 56 S.Ct. 764, 80 L.Ed. 1205

---

**9.** With the addition of $176,000 in stipulated compensation, the total jury award was $8,389,099.

(1936). There is no Seventh Amendment right to a jury trial in a condemnation action. *Reynolds,* 397 U.S. at 18; *see also* Fed.R.Civ.P. 71A(h). However, if a party elects a jury, it is the jury that determines just compensation "within ground rules established by the trial judge." *Reynolds,* 397 U.S. at 20; Fed.R.Civ.P. 71A(h). The property owner bears the burden of proving the value of the condemned land. *US ex rel. TVA v. Powelson,* 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943).

### 2. New Trial

The district court granted a new trial because it concluded that Judge Browning's testimony was improperly admitted and that the award was against the weight of the evidence. If either ground could support a new trial, we may not reverse that decision. Norville insists that his seven acres remaining after condemnation have dramatically diminished in value on a per-square-foot basis compared to the value per square foot of his full 11–acre parcel. He argues, and the district court agreed, that the jury's failure to award severance damages resulted in an award outside the range of the evidence and contrary to the expert testimony. We disagree. When the evidence is viewed in its entirety, the jury award was consistent with the weight of the evidence.

### a. Judge Browning's testimony

■ The district court relied heavily on its perception that the jury misused or was impermissibly prejudiced by Judge Browning's testimony. The only evidence of the impact of Judge Browning's testimony, however, is the newspaper article, published after the trial, which quoted one juror as saying

It stuck out to me a lot due to the fact that (Norville) said he never, ever wanted the courthouse in that corner of the property. . . . Judge Browning pointed to that corner of the property and said (Norville) wanted it here. I highly doubt that Judge Browning would lie in his own federal court, so I had to go with him.

■ A juror's observations may not be used as grounds to grant a new trial absent exceptional circumstances. Rule 606(b) of the Federal Rules of Evidence prohibits a juror from testifying about the jury's deliberations or how the jurors reached their conclusions unless "extraneous prejudicial information was improperly brought to the jury's attention." Neither party alleges that extraneous prejudicial information was brought to the jury's attention. Rule 606(b) also prohibits any evidence of any statement by a juror "concerning a matter about which the juror would be precluded from testifying" from being used in an inquiry into a jury's verdict. There was no official inquiry into the jury's verdict in this case. Apparently, the juror's post-verdict statements to the press distorted the lens through which the district court viewed the verdict. The statements should not have been considered.[10]

■ Judge Browning, as the judge in charge of the courthouse relocation project, possessed first hand knowledge concerning Norville's efforts to generate interest in his property for the courthouse. Judge Browning's testimony undercut Norville's testimony that the remaining land would be less desirable, and hence, less valuable, if the courthouse was built on the northern four acres.

---

10. If we ignore for the moment the court's improper use of the juror's statements, those statements, taken in context, do not support the court's decision to grant a new trial. The balance of the quotes from the juror explained that the jury carefully considered the full range of evidence presented and did not find Norville's appraisers credible. For example, the same juror stated, "[t]hey never proved to us that the market wanted what the Norvilles said they wanted to do. . . . We couldn't accept his vision (for) the future. I just don't see it happening."

Judge Browning's testimony may have influenced the jury's decision not to award severance damages, but the influence was not improper. The jury was entitled to conclude that Norville, an experienced developer in Tucson, would not have sought out the courthouse for his property if he thought it would diminish the value of his remaining property. Moreover, the parties fully briefed the issues surrounding Judge Browning's testimony before he was allowed to testify. There were no surprises at trial. Norville declined to cross examine Judge Browning and neither party requested limiting instructions regarding the jury's use of Judge Browning's testimony. We conclude, therefore, that Judge Browning's testimony was properly admitted.

*b. Size of Jury Award*

We must next determine whether the jury award was outside the range of the evidence. Norville insists that the "scope of the evidence rule" in condemnation cases requires that the fact finder award a value between the extremes of the expert valuations. *See e.g., United States v. 1,162.65 Acres of Land,* 498 F.2d 1298, 1301, n. 5 (8th Cir.1974)("The rule is that an award of just compensation will not be disturbed if it is within the scope of the evidence ... [which generally means] determining whether the award falls within the extremes of the adverse parties' experts' opinion testimony."). We have found no case that requires a jury award to fall between the extremes of expert appraisals without regard to other testimony that may bear on the property's valuation or that bears on the knowledge or credibility of the appraisers. In fact, we find just the opposite. Courts have rejected a rigid application of the scope of the evidence rule. *See e.g., 1,162.65 Acres of Land,* 498 F.2d at 1301, n. 5 ("where the totality of the evidence supports the award it will be upheld notwithstanding the fact it is outside the range of all the experts' valuations."). "The awarding of [a] lesser sum, or other difference of opinion be-

tween the trier of the facts and the witnesses, does not necessarily dictate the setting aside of the award .... especially ... if there is other evidence upon which the award has been based." Nichols on Eminent Domain, § 17.3, 17–42.

Here, we find ample evidence that supports the jury's decision to depart from the appraisers' recommendations. Although Norville observes, correctly, that Dilmore never appraised the property and did not offer his own, independent valuation, that observation misses the point. Dilmore was a rebuttal witness, not an independent appraiser. He accepted Norville's appraisers' data and their basic assumptions. His role, like that of Corbett, was to expose flaws in their use of the data and to offer a "corrected" valuation.

Much of Norville's argument relies on the absence of severance damages in the jury's award. He belabors the point that the jury's failure to award severance damages is dispositive because every expert testified to a diminished value of the land remaining after the taking. The jury's award translates into $14.50 per square foot before and after condemnation. We, of course, do not know whether the jury calculated its award on a per-square-foot basis, or whether it simply determined total "before" and "after" values, as the verdict form asked only for the total valuations. Even if we assume that the jury deliberately assigned identical before and after per-square-foot values, this suggests that the jury rejected the appraisers' contentions that the remaining seven acres was diminished in value after the courthouse corner was taken, and simply declined to award "severance damages."

The jury's valuation of $14.50 per square foot before condemnation falls between Norville's estimate of $38 and the government's estimate of $10.75. The $14.50 after condemnation figure, however, is higher than either Norville's value of $11.94 or the government's estimate of $6.99 per square foot. The United States contends

that the jury's decision not to reduce the "after" value reflected a "reasonable compromise" that Norville was "unlikely to suffer any significant loss in value on the remaining property." The jury heard testimony from which it could have reasonably concluded that Norville's remaining seven acres would not diminish in value after the taking. Its verdict, therefore, was not against the clear weight of the evidence.

The government urges us not to view the "after" award in isolation. We agree that we cannot isolate the "after" award from testimony that might bear on whether the remaining property would diminish in value. The "totality of the evidence" approach that looks beyond the specific numbers used in the expert opinions is appropriate. *See 1,162.65 Acres of Land,* 498 F.2d at 1301. This approach reflects the discretion accorded the jury in weighing the credibility of witnesses and looking critically at experts' analyses. We cannot conclude, as Norville urges, that each component of the jury's award must be within the range of each component of expert testimony, and that evidence other than the appraisals has no role.[11] Were we to adopt Norville's suggested approach, we would discredit the role of the jury and give unbounded discretion to the district judge to override a jury's verdict. We conclude that, here, the clear weight of the evidence justifies the jury's decision to find Norville's appraisals suspect and to reject the appraisers' assertions of diminished value in the remaining property.

Our conclusion is bolstered by our review of the jury instructions which neither party challenges on appeal. The jury was expressly entrusted with all credibility determinations including whether the evidence that Norville's remaining seven acres would diminish in value after the taking was reliable. Jury instruction number 11 explained the concept of severance damages. "The owner is entitled to just compensation, not only for the fair market value of the interest actually taken, but also for the amount equivalent to the lowering or diminution of the fair market value, *if any,* of the owner's interest in the remaining land, due to the severance of the land which was taken." (emphasis added). The jury, therefore, was acutely aware of the concept of severance damages. We note especially the following instructions to the jury regarding its consideration of witness testimony:

# 3: You may disbelieve all or any part of any witness's testimony.

# 4: A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something ... which is inconsistent with the witness's present testimony. If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

# 17: The government must pay fair market value for that which it has acquired and *severance damages, if any,* to the remainder, but nothing more. (emphasis added).

# 20: [I]f you should decide that the reasons given in support of a landowner's opinion as to fair market value are not sound, you may reject that opinion; or you may give it any weight you may think it deserves.

# 21: Both sides in this case have offered opinion evidence as showing the value of the property taken herein. You are the sole judges of the credibility of the witnesses who have testified before you, and of the weight to be given the testimony of each.

# 22: You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that

---

11. The government observes that the jury could have reached an identical total valua-
tion with a different combination that included severance damages.

any such opinion is not based upon sufficient study, investigation, knowledge, or experience, or if you should conclude that the reasons given in support of the opinion are not sound, you may reject it entirely.

# 25: In determining fair market value, you may consider not only the opinions of the various witnesses, but also other evidence which may assist you such as the location of the property, the surroundings and general environment, any peculiar suitability of the property for particular uses, and the reasonable probabilities as to future potential uses, if any for which the property was suitable or physically adaptable . . . .

"Rule 71A(h) . . . makes clear that a jury in federal condemnation proceedings is to be confined to the performance of a single narrow but important function—the determination of a compensation award *within ground rules established by the trial judge.*" *Reynolds,* 397 U.S. at 20 (emphasis added). Although the judge may "tell the jury the criteria it must follow in determining what amount will constitute just compensation," the "precise issue of the amount of compensation" is left for the jury. *Id.* Nowhere did the judge instruct that the expert opinions were binding on the jury or bounded the value it could assign for just compensation. Neither party complains on appeal that the ground rules in the first trial were wrong. In light of the jury instructions and the evidence presented, the first jury's verdict should stand. From the totality of evidence, therefore, we cannot conclude that the jury delivered a verdict against the clear weight of the evidence.

## CONCLUSION

The district court erred in granting a new trial. Where the jury's verdict is not against the clear weight of the evidence, a district court abuses its discretion in ordering a new trial. *See Roy,* 896 F.2d at 1176. Such is the case here. We find no evidence of impropriety in the jury pro-ceedings or in the jury instructions. The district court should not second-guess a jury verdict based on a juror's statements to the press after a verdict is entered. All of the evidence, including that which weakens appraisers' expert opinions as to the value of the property or the likelihood that the remainder will diminish in value must be considered. Severance damages need not be awarded in every partial takings case. The jury award was not outside the range of evidence presented and a new trial should not have been granted.

We reverse the grant of a new trial and instruct the district court to reinstate the original jury verdict. In light of our ruling, we need not address the United States' contention that the court erred in rejecting its offer of additur instead of a new trial or the alleged errors in the court's pre-trial rulings in the second trial.

REVERSED with directions.